**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| HIGHMORE FINANCING CO. I, LLC, <br><br> Plaintiff, <br><br> -against- <br><br> THE GREIG COMPANIES, INC., JASON ALLEN GREIG, DATASSURE CORP., JEFFREY SPARROW, STORBYTE INC., DIAMOND LAUFFIN, STEVEN GROENKE, PAYRANGE INC., JOHN DOE, JOHN DOE, JOHN DOE, and JOHN DOE. <br><br> Defendants. | **COMPLAINT AND DEMAND FOR JURY TRIAL** <br><br> Civil Action No.: |

**COMPLAINT FOR VIOLATIONS OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO), 18. U.S.C. § 1961 ET SEQ.; VIOLATIONS OF 18. U.S.C. § 1962 ET SEQ.; BREACH OF CONTRACT; FRAUD IN THE INDUCEMENT; UNJUST ENRICHMENT; AND CONVERSION**

Plaintiff, Highmore Financing Co. I, LLC ("Highmore"), brings this Complaint against Defendants The Greig Companies, Inc. ("TGC"), Jason Allen Greig ("Greig"), Datassure Corp. ("Datassure"), Jeffrey Sparrow ("Sparrow"), Storbyte Inc. ("Storbyte"), Diamond Lauffin ("Lauffin"), Steven Groenke ("Groenke"), PayRange Inc. ("PayRange"), John Doe ("Doe 1"), John Doe ("Doe 2"), John Doe ("Doe 3") and John Doe ("Doe 4" and together with Doe 1, Doe 2 and Doe 3, "Does 1-4") (together, "Defendants") and alleges as follows:

**NATURE OF THE CASE**

1.      This action arises from a highly sophisticated fraudulent scheme carried out by Defendants—including two technology companies, two computer equipment vendors, a law firm and individuals acting as executives, directors, owners, agents and/or representatives of those entities—as members of an enterprise that has cost Highmore, a financing company,

$19,954,515.07, not including subsequent interest and fees which continue to accrue.  Defendants worked together to fraudulently obtain, launder and embezzle funds from Highmore under the pretense of Highmore issuing supplier credit financing to fund the purchase of computer technology equipment.  The scheme involved the use of many falsified documents, entry into multiple agreements with the knowledge that TGC was not financially capable of repayment, and the movement of Highmore's money between and among Defendants in contravention of those agreements to launder and embezzle the fraudulently obtained funds.

2.     Highmore is in the business of making alternative investments, including in the lending space.  It utilized the services of Zenith Insured Credit ("Zenith"), a purchaser of supplies broker, to act as the buying agent for Highmore and identify a potential transaction for Highmore to fund with TGC.  Zenith i) introduced TGC, Greig, Datassure and Sparrow to Highmore, ii) collected the diligence documents from TGC, Greig, Datassure and Sparrow, and iii) liaised with them throughout the relationship.  Greig sought funding for the purchase of high-end computer servers and ancillary equipment from Storbyte and PayRange, both computer and technology equipment suppliers, to support TGC's affiliate and Greig's company, Datassure.  Unbeknownst to Highmore at the time, TGC, Greig, Datassure, Sparrow, Storbyte and PayRange, along with Groenke and Lauffin, both representatives of Storbyte—and others, including Equinox and Harju, the escrow agent of TGC, Datassure and Storbyte, and Does 1-4—were each and all members of the same associated-in-fact enterprise, which was conspired and formed with the intent to defraud, embezzle, and launder funds from Highmore for the benefit of Defendants.

3.     Defendants conducted the affairs of the enterprise by engaging in a three-step pattern of racketeering activities, including wire fraud and mail fraud, which had an effect on interstate commerce.  First, Defendants TGC, Greig, Sparrow and Datassure utilized telephone

170421133

calls and emails to provide falsified financial statements, documents and information to induce Highmore to enter into a financing arrangement and later to increase the amount of supplier credit financing issued on two occasions. Then, Defendants TGC, Greig, Sparrow, Storbyte, Groenke, Lauffin and PayRange utilized telephone calls and emails to create, modify and submit fraudulent invoices for computer equipment with inflated pricing to get Highmore to fund each of five transactions over the course of four months. Sparrow prepared the invoices on behalf of TGC and Greig signed them. Greig and Sparrow emailed the invoices on behalf of TGC. Storbyte, Lauffin and Groenke supplied Storbyte invoices that were modified by either i) Storbyte, Lauffin and/or Groenke, or ii) TGC, Greig and/or Sparrow to include inflated prices and in some cases equipment that was not actually sold by Storbyte.

4.        Then, the law firm and lawyer serving as the escrow agent to TGC, Datassure and Storbyte, Equinox Business Law Group PLLC ("Equinox") and attorney Shawn Harju ("Harju"), utilized emails and wires to disburse the wired funds among Defendants in contravention of the transaction documents. Storbyte and Lauffin, TGC and Greig, Datassure and Sparrow, and Equinox and Harju signed escrow agreements related to the transactions indicating that funds wired from Highmore would be used to pay Storbyte in accordance with the applicable invoices and authorizing the funds to be wired to Equinox as the escrow agent. Then, Storbyte and Lauffin, TGC and Greig, and Datassure and Sparrow wrote signed letters to Equinox instructing Equinox to disburse the wired funds in contravention to the applicable invoices and escrow agreement, and Harju and Equinox effectuated the disbursements accordingly.

5.        Does 1-4 assisted Defendants in i) producing and transmitting falsified financial documents and fraudulent invoices, ii) communicating misinformation to Zenith and Highmore

170421133

and/or iii) distributing, collecting and spending the misappropriated funds obtained as a result of the enterprise's fraudulent scheme.

6.      When each of these three steps was completed, Defendants—having just successfully embezzled and laundered funds from Highmore—in turn, engaged in a cyclical pattern whereby they repeated the three steps to defraud Highmore of even more funds. Defendants ceased submitting fraudulent invoices after May 30, 2020, when Defendant TGC had maxed out the available supplier credit financing and defaulted on the $19,954,515.07 in repayment due to Highmore for the prior transactions carried out by the enterprise.  Defendants TGC and Greig then made repeated attempts to explain and purportedly resolve TGC and Greig's defaults by again providing false, misappropriated, and/or inaccurate financial documents and information about TGC and Datassure's financial status to Highmore via email and telephone.

7.      Defendants' pattern of racketeering activity, including their repeated i) misrepresentations via telephone and in person, including through the use of aliases; ii) provision of fraudulent business records, misappropriated financial information, falsified emails and letters, and inflated and falsified invoices via email; and iii) disbursement of fraudulently obtained wired funds from Highmore amongst Defendants via wire, logically, substantially and foreseeably caused Highmore to incur millions in damages.  Highmore now seeks recovery.

## PARTIES

8.      Plaintiff Highmore is a Delaware limited liability company with its principal place of business at Highmore Group Advisors LLC, 1180 Avenue of the Americas, 8th Floor, New York, NY 10036.

170421133

9.     Upon information and belief, Defendant TGC is a Nevada corporation with its principal place of business located at 2 Park Plaza, Suite 1000, Irvine, CA 92614.  TGC is an affiliate of Datassure.

10.     Upon information and belief, Defendant Greig is a resident of Washington, having an address at 984 Cameron Ridge Lane, Ferndale, WA 98248.  Upon information and belief, Greig is a Managing Director of TGC and the Chairman of the Board of Datassure.  Upon information and belief, Greig is the owner and sole shareholder of Datassure.

11.     Upon information and belief, Defendant Datassure is a Nevada corporation with its principal place of business located at 2 Park Plaza, Suite 1000, Irvine, CA 92614.  Datassure is an affiliate of TGC and Greig.  On January 1, 2019, Greig purchased from TGC all shares of Datassure for $2,500,000.

12.     Upon information and belief, Defendant Sparrow is a resident of California, having an address at 2045 Campo Verde Court, Escondido, CA 92026.  Upon information and belief, Sparrow formerly held multiple positions at Datassure, including Chief Executive Officer.  Also, upon information and belief, Sparrow at times acted on behalf of TGC as an authorized agent and representative of TGC with TGC and Greig's knowledge and consent.

13.     Upon information and belief, Defendant Storbyte is a Maryland corporation with its principal place of business located at 1200 G Street, NW, Suite 800, Washington, DC, 20005.

14.     Upon information and belief, Defendant Groenke is a resident of Maryland, having an address at 618 Ponte Villas N, #165, Baltimore, MD 21230.  Upon information and belief, Defendant Groenke cofounded Storbyte and is the Chief Executive Officer of Storbyte.

15.     Upon information and belief, Defendant Lauffin is a resident of California, having an address at 72 Edgar Ct., Newbury Park, CA 91320.  Upon information and belief, Defendant

170421133

Lauffin cofounded Storbyte, formerly was the Chief Evangelist and Design Architect at Storbyte and at all relevant times to this action was employed by and/or acted as an agent to Storbyte with Storbyte's knowledge and consent.  Lauffin maintained and used a Storbyte email address to communicate with Highmore and Defendants with respect to the allegations herein.

16.     Upon information and belief, Defendant PayRange is a Tennessee corporation with its principal place of business located at 9600 NE Cascades Pkwy, Suite 280, Portland, OR 97220.

## JURISDICTION AND VENUE

17.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) because this action arises, in part, under the Federal Racketeer Influenced and Corrupt Organizations Act ("Federal RICO") and thus involves questions of federal law.

18.     This Court also has original subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiff and Defendants.

19.     This Court also has supplemental jurisdiction over Plaintiff's additional and related claims arising under New York law pursuant to 28 U.S.C. § 1367, as those claims are substantially related to the Federal RICO claims and arise from a common nucleus of operative facts, and thus they form part of the same case or controversy under Article III of the United States Constitution.

20.     This Court has personal jurisdiction over Defendants because Defendants: i) transact business in New York, purposely direct or directed their actions toward New York, and have the requisite minimum contacts with New York to constitutionally permit the Court to exercise jurisdiction; ii) have committed multiple acts of fraud by computer, wire, and telephone directed to Zenith—Highmore's buying agent that has a programmatic relationship with Highmore whereby Highmore funds transactions originated by Zenith—and Highmore in the Southern

District of New York, thereby purposely availing themselves of the benefits and protections of the District; and iii) as members of the conspiracy to defraud Highmore and launder funds obtained from Highmore for the benefit of Defendants, upon information and belief, knew that a) Zenith and Highmore were located in New York at all times relevant to the facts herein, b) the fraudulently obtained and laundered funds were originating from Highmore in New York, and c) the harm for the fraud would be felt by Highmore in New York.  Furthermore, this Court has jurisdiction over Defendants because certain Defendants agreed by contract to submit to the personal jurisdiction of this Court and the ends of justice require that parties residing in other districts be brought before the Court pursuant to 18 U.S.C. § 1965(a)-(b).

21.     This Court has personal jurisdiction over TGC because TGC transacts business in New York and delivered—through Greig, Sparrow, and/or other purported individuals acting on behalf of TGC—the September 24, 2019 payment agent agreement between TGC and FF Supply, LLC d/b/a Zenith (the "Payment Agent Agreement"), as well as telephone calls, invoices, documents, and emails in furtherance of the fraudulent scheme to defraud Highmore, to Zenith and Highmore in New York, New York.  Additionally, TGC agreed in writing in the Payment Agent Agreement, as executed by Greig on TGC's behalf, to irrevocably submit to the exclusive jurisdiction of the federal and state courts in New York County, New York with respect to the Payment Agent Agreement and expressly waived any defense of lack of personal jurisdiction.[12]  Moreover, as a member of the conspiracy to defraud Highmore and launder funds obtained from Highmore for the benefit of Defendants, TGC, upon information and belief, knew

---

[1] Due to volume, the exhibits are attached in chronological order for ease of review.

[2] A copy of the Payment Agent Agreement is attached hereto as Exhibit I.  The Payment Agent Agreement provides that "Seller and Buyer irrevocably submit and attorn to the exclusive jurisdiction of the federal and state courts in New York County, New York with respect to these Terms and the Sales Contract . . . and waive any defense of lack of personal jurisdiction or forum non convenience in response to any such action or proceeding, or seek to change venue from the forum in which any such action is initially commenced."  Ex. I, at § 21.

that i) Zenith and Highmore were located in New York at all times relevant to the facts herein, ii) the fraudulently obtained and laundered funds distributed to TGC were originating from Highmore in New York, and iii) the harm for the fraud would be felt by Highmore in New York. This Court also has personal jurisdiction over TGC because the ends of justice require that TGC be brought before the Court pursuant to 18 U.S.C. § 1965(a)-(b) if it is a resident in another district.

22.     This Court has personal jurisdiction over Greig because Greig transacts business in New York, including on behalf of himself, TGC and Datassure.   Greig delivered the September 24, 2019 continuing guaranty executed by Greig as guarantor (the "Guaranty"), in which Greig personally guaranteed the performance of TGC under the Payment Agent Agreement, as well as telephone calls, invoices, documents, and emails on behalf of himself, TGC and Datassure in furtherance of the fraudulent scheme to defraud Highmore, to Zenith and Highmore in New York, New York.[3]  Greig also agreed in writing in the Guaranty to submit to the personal jurisdiction of any federal court located in New York County, New York in any action arising out of or related to the Guaranty in any manner or respect.[4]   Additionally, as a member of the conspiracy to defraud Highmore and launder funds obtained from Highmore for the benefit of Defendants, Greig, upon information and belief, knew that i) Zenith and Highmore were located in New York at all times relevant to the facts herein, ii) the fraudulently obtained and laundered funds distributed to TGC, Datassure, and Greig were originating from Highmore in New York, and iii) the harm for the fraud would be felt by Highmore in New York.  Furthermore, this Court

---

[3] A copy of the Guaranty is attached hereto as Exhibit K.  The Guaranty provides that "[t]his Guaranty has been signed and delivered to ZENITH for acceptance at New York, New York." Ex. K, at 5.

[4] The Guaranty provides that "subject to ZENITH's sole and absolute election, all legal actions or proceedings in any manner or respect arising out of or related to this Guaranty shall be brought and litigated only in courts having situs New York County, New York; and the Guarantor hereby consents to and submits to the jurisdiction of any local, state or federal court located in New York County, New York, and hereby waive any right the Guarantor may have to transfer or change the venue of any such legal action or proceeding." *Id.*

170421133

has jurisdiction over Greig because the ends of justice require that Greig be brought before the Court pursuant to 18 U.S.C. § 1965(a)-(b) if he is a resident in another district.

23.     This Court has personal jurisdiction over Datassure because Datassure delivered—through Greig, Sparrow and other purported individuals acting on behalf of Datassure—telephone calls, invoices, documents and emails in furtherance of the fraudulent scheme to defraud Highmore, to Zenith and Highmore in New York, New York.  Also, as a member of the conspiracy to defraud Highmore and launder funds obtained from Highmore for the benefit of Defendants, Datassure, upon information and belief, knew that i) Zenith and Highmore were located in New York at all times relevant to the facts herein, ii) the fraudulently obtained and laundered funds distributed to Datassure were originating from Highmore in New York, and iii) the harm for the fraud would be felt by Highmore in New York.  Furthermore, this Court has personal jurisdiction over Datassure because the ends of justice require that Datassure be brought before the Court pursuant to 18 U.S.C. § 1965(a)-(b) if it is a resident in another district.

24.     This Court has personal jurisdiction over Sparrow because Sparrow delivered—on behalf of Datassure and himself—telephone calls, documents and emails in furtherance of the fraudulent scheme to defraud Highmore, to Zenith and Highmore in New York, New York.  Additionally, as a member of the conspiracy to defraud Highmore and launder funds obtained from Highmore for the benefit of Defendants, Sparrow, upon information and belief, knew that i) Zenith and Highmore were located in New York at all times relevant to the facts herein, ii) the fraudulently obtained and laundered funds distributed to Datassure were originating from Highmore in New York, and iii) the harm for the fraud would be felt by Highmore in New York.  Furthermore, the ends of justice require that Sparrow be brought before the Court pursuant to 18 U.S.C. § 1965(a)-(b) if he is a resident in another district.

170421133

25.     This Court has personal jurisdiction over Storbyte because upon information and belief, Storbyte, as a member of the conspiracy to defraud Highmore and launder funds obtained from Highmore for the benefit of Defendants, knew that i) Zenith and Highmore were located in New York at all times relevant to the facts herein, ii) the fraudulently obtained and laundered funds distributed to Storbyte were originating from Highmore in New York, and iii) the harm for the fraud would be felt by Highmore in New York.  Storbyte—through Lauffin and/or other employees and agents of Storbyte—utilized emails and telephone calls to conspire with Defendants to conduct the fraudulent scheme and to transmit inflated and fraudulent invoices intended to embezzle and launder funds from Highmore.  Lauffin, on behalf of himself and Storbyte, engaged in multiple phone calls with Zenith.  On June 29, 2021, Storbyte's Chief Executive Officer, Groenke, attended an in-person meeting with Highmore executives in New York to discuss the invoices submitted to Highmore in support of TGC's funding requests.  Furthermore, the ends of justice require that Storbyte be brought before the Court pursuant to 18 U.S.C. § 1965(a)-(b) if it is a resident in another district.

26.     This Court has personal jurisdiction over Groenke because upon information and belief, Groenke, as a member of the conspiracy to defraud Highmore and launder funds obtained from Highmore for the benefit of Defendants, knew that i) Zenith and Highmore were located in New York at all times relevant to the facts herein, ii) the fraudulently obtained and laundered funds distributed to Storbyte were originating from Highmore in New York, and iii) the harm for the fraud would be felt by Highmore in New York.  Groenke—on behalf of himself and Storbyte— knew that Lauffin acted as an employee and agent of Storbyte when he utilized emails and telephone calls to conspire with Defendants to conduct the fraudulent scheme and to transmit inflated and fraudulent invoices intended to defraud and launder funds from Highmore.  On

170421133

June 29, 2021, Groenke met with Highmore executives in New York to discuss the inflated and fraudulent Storbyte invoices following TGC's failure to repay Highmore. Furthermore, the ends of justice require that Groenke be brought before the Court pursuant to 18 U.S.C. § 1965(a)-(b) if he is a resident in another district.

27.     This Court has personal jurisdiction over Lauffin because upon information and belief, Lauffin, as a member of the conspiracy to defraud Highmore and launder funds obtained from Highmore for the benefit of Defendants, knew that i) Zenith and Highmore were located in New York at all times relevant to the facts herein, ii) the fraudulently obtained and laundered funds distributed to Storbyte were originating from Highmore in New York, and iii) the harm for the fraud would be felt by Highmore in New York. Lauffin—on behalf of himself and Storbyte—utilized emails and telephone calls to conspire with Defendants to conduct the fraudulent scheme and to transmit inflated and fraudulent invoices and information intended to defraud and launder funds from Highmore. Lauffin also engaged in multiple phone calls with Zenith in New York related to funding for equipment purportedly purchased from Storbyte by TGC. These calls also served as supplier verification by Zenith on behalf of Highmore. Furthermore, the ends of justice require that Lauffin be brought before the Court pursuant to 18 U.S.C. § 1965(a)-(b) if he is a resident in another district.

28.     This Court has personal jurisdiction over PayRange because upon information and belief, PayRange, as a member of the conspiracy to defraud Highmore and launder funds obtained from Highmore for the benefit of Defendants, knew that i) Zenith and Highmore were located in New York at all times relevant to the facts herein, ii) the fraudulently obtained and laundered funds were originating from Highmore in New York, and iii) the harm for the fraud would be felt by Highmore in New York. Upon information and belief, PayRange—through one or more

11

170421133

employees or representatives of PayRange—utilized emails and telephone calls to conspire with Defendants to conduct the fraudulent scheme.  Additionally, PayRange—through one or more employees or representatives of PayRange—was cc'd on emails from TGC and Greig to Zenith submitting purported diligence materials for Zenith and Highmore's review.  Furthermore, the ends of justice require that PayRange be brought before the Court pursuant to 18 U.S.C. § 1965(a)-(b) if it is a resident in another district.

29.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because i) Defendants transact affairs in the Southern District of New York, ii) a substantial part of the events or omissions giving rise to this action occurred in this District, iii) the ends of justice require that other parties residing in other districts be brought before the Court in this District, and iv) certain Defendants agreed in writing that venue is proper in this District.  Additionally, at all times relevant to this action, Plaintiff maintained its principal place of business in New York.  Until February 28, 2021, Plaintiff maintained its principal place of business at 750 Lexington Avenue, 24th Floor, New York, NY 10022.  Plaintiff's current principal place of business is located at 1180 Avenue of the Americas, 8th Floor, New York, NY 10036.

## FACTUAL BACKGROUND

**I.**     **Greig and TGC Induce Highmore to Agree to Finance Equipment for Datassure Through the Use of Fraudulent Financial Documents and Statements During the Deal Sourcing and Due Diligence Phases**

30.     Pursuant to an October 3, 2018 program agreement between Highmore and Zenith, Zenith has a programmatic relationship with Highmore in which Zenith routinely acts as the buying agent for Highmore and identifies potential transactions for Highmore that Highmore funds

170421133

by either purchasing the transaction from Zenith or originating the transaction based on Zenith's sourcing information.[5]

31.     In or about July 2019, Cole Reifler, founder and CEO of Zenith, was introduced to Greig of Datassure and TGC by Sparrow to discuss a potential transaction on behalf of Highmore. Soon after, Reifler introduced Highmore to Greig.

32.     Sparrow and Greig sought from Zenith and Highmore financing for the purchase of high-end computer servers and ancillary equipment for TGC to be installed and hosted at Datassure, Greig's new data technology endeavor.

33.     Greig claimed to be a significant shareholder of The Greig Companies, a family business with deep European ties to the insurance, reinsurance, and shipping industries. Unbeknownst to Highmore at the time and later discovered through investigation and upon information and belief, Greig has no such ties to the European companies that contain "Greig" in their names.  Upon information and belief, TGC incorporated on February 25, 2015.  On August 13, 2015, TGC filed a Form D - Notice of Exempt Offering of Securities with the U.S. Securities and Exchange Commission (SEC) that was executed by Greig as the President of TGC ("Form D").[6]  Form D declined to disclose TGC's revenue range and aggregate net asset value range, but it indicated that TGC offered and sold $250,000,000 in equity shares with a total of five new investors.  Upon information and belief, the offering and purchase price for equity shares in TGC on this form are inflated.

---

[5] Because of Zenith's role as the buying agent and liaison between TGC and Highmore, references herein to Highmore and the materials and information provided to Highmore also include Zenith and the materials and information provided to Zenith and then forwarded by Zenith to Highmore.  All Defendants knew or should have known that Highmore was the lender on all relevant transactions and funded those transactions based on a review of documents, communications and information provided by Defendants.

[6] A copy of TGC's August 13, 2015 Form D is attached hereto as Exhibit A.

34.     As part of the due diligence process, on July 2, 2019, Greig provided via email to Zenith a Dropbox folder containing diligence materials.[7]   Among the materials provided was a business overview of TGC purporting to show $250,000,000 in capitalization from Greig and other family trusts and reflecting Greig as a Board Director and Managing Director of TGC in North America.   TGC, Greig, Datassure and Sparrow knew that any materials they provided to Zenith during the due diligence period and throughout their relationship with Zenith and Highmore would be shared with Highmore to review as the lender.   As part of the initial discussions about financing that occurred in a series of phone calls between Dipak Jogia, Henry Beggin and Jennie Jiang, as representatives of Highmore, Reifler, as a representative of Zenith, and Greig and Sparrow in or about September 2019, Highmore management and Zenith explained to Greig and Sparrow, who were acting as representatives of both TGC and Datassure, that Zenith's role was to source deals for Highmore and interface with prospective borrowers and that Highmore's role was to fund the deals and act as the lender.

35.     Greig also furnished Highmore with several years of corporate tax returns and bank statements reporting the current net assets of TGC as totaling in excess of approximately $330,000,000.

36.     Greig also provided Highmore with Financial Statements and Independent Accountants' Compilation Reports for TGC purportedly certified by Deloitte, LLP ("Deloitte"), dated December 31, 2016, December 31, 2017, December 31, 2018, and December 31, 2019,[8] as

---

[7] A copy of the July 2, 2019 correspondence is attached hereto as Exhibit E.

[8] Copies of the Financial Statements and Independent Accountants' Compilation Reports purportedly certified by Deloitte are attached hereto as Exhibits B, C, D and AC.   While TGC's year-end 2019 financial statements do not include a certification by Deloitte, the document lists Deloitte as TGC's "Accountants."   Exhibit AC, at 3.

well as an independent auditor report from GBH CPAs, PC, confirming approximately $250,000,000 in cash deposits.

37.     Greig also provided a personal financial statement reflecting a net worth just shy of $300,000,000.

38.     Greig also participated in a final diligence phone call with Jogia, Jiang and Beggin of Highmore, Reifler and Casey on behalf of Zenith, and Sparrow on September 23, 2019, during which he made additional representations about TGC's financial status, including that TGC's technology saved up to $60,000,000 in demurrage charges and that the technology would continue to be used by TGC.

39.     Unbeknownst to Highmore at the time, and later discovered through investigation, and upon information and belief, the TGC business overview, TGC financial statements, Greig's personal tax documents, Greig's personal financial statements and Greig's representations on behalf of TGC and himself that were provided by Greig as part of the due diligence process contained inaccurate information and inflated financial figures for both TGC and Greig, and/or were misappropriated from companies unrelated to Greig, and/or were entirely falsified.

40.     Specifically, with respect to the Financial Statements and Independent Accountants' Compilation Reports for TGC purportedly certified by Deloitte, Deloitte confirmed that neither TGC nor Greig was ever a Deloitte client, which was unbeknownst to Highmore and Zenith at the time Greig furnished the reports.  Indeed, in or about September 2021, Highmore learned that Deloitte repeatedly sent letters to TGC instructing the company to cease and desist

170421133

from making false representations, and when TGC/Greig failed to respond, Deloitte reported the matter to the SEC.[9]

41. The enterprise and its fraudulent scheme were sophisticated. Upon information and belief and unbeknownst to Highmore at the time, the enterprise members began planning their fraudulent scheme in or before August 2015 when TGC and Greig filed a fraudulent financial document, Form D, with the SEC. Accordingly, the fraud that victimized Highmore was years in the making. Upon information and belief, the enterprise also involves other members, including entities and individuals Does 1-4, who assisted in producing and transmitting falsified financial statements, fraudulent tax returns and other inflated and inaccurate financial information.

## II.   TGC and Greig Enter into Agreements With Highmore Related to the Financing of Datassure's Equipment Despite Knowing that TGC and Greig did not have the Financial Capabilities of Fulfilling Their Obligations Under the Agreements

### A.   The Payment Agent Agreement

42. In late September 2019, Greig provided Zenith with a copy of a resolution of the directors of TGC that was executed by five purported directors and officers of TGC on September 20, 2019 (the "Board Resolution") with Greig abstaining. The Board Resolution stated that the purported directors of TGC allegedly reviewed and approved the Payment Agent Agreement. On September 25, 2019, at Zenith's request, Timothy Abell, a purported director of TGC, and Ann Lereau, the purported Secretary of TGC, sent emails to the Managing Director of Zenith confirming that the directors had indeed signed the Board Resolution with Abell signing it himself. Unbeknownst to Highmore at the time, and later discovered through investigation, upon information and belief, none of the signatories to the Board Resolution aside from Greig are actual persons, including Abell, and Greig forged the other signatures.

---

[9] Copies of communications between Deloitte and the Washington Department of Financial Services are attached hereto as Exhibit AT.

43.     After reviewing the financial documentation provided by Greig and conducting additional due diligence—including verifying Storbyte, the equipment supplier, as a bona fide supplier—Zenith entered into the September 24, 2019 Payment Agent Agreement with TGC, whereby Zenith agreed to act as payment agent for TGC with respect to computer equipment that Zenith would purchase from Storbyte on behalf of TGC to deliver to Datassure.

44.     Greig executed the Payment Agent Agreement on TGC's behalf despite knowing that TGC did not have the financial ability to repay Highmore's loans.

45.     The Payment Agent Agreement governs the "present or future sale of goods and services" between TGC, as the buyer, and Zenith, as the seller, and provided that "Seller's express acceptance of a Purchase Order by its issuance of a written sales contract or invoice (the "Sales Contract") or upon commencement of performance by Seller, these Terms and the terms of the Sales Contract become a binding contract between Buyer and Seller."  Exhibit I, at 1.

46.     Section 3 of the Payment Agent Agreement establishes the payment procedures for TGC to pay Zenith and required each invoice to be paid within 120 days of the invoice date:

> Payment of the full amount of each invoice issued pursuant to a Sales Contract ("invoice") shall be made to Seller on or before the due date stated in the invoice, addressed as indicated on the invoice, in the currency established in the invoice, subject to Paragraph 3.1, without any defense, offset, counterclaim or deduction, all of which are hereby expressly waived by Buyer.  *Id.* at § 3.2.
>
> Each invoice is to be paid within 120 days of invoice date.  Any invoices not paid within 3 days of the invoice date shall be subject to a late fee of 2.00% of the amount of the invoice for each 30 day period, or portion thereof, that the invoice remains outstanding past the original 120 day terms.  *Id.* at § 3.4.

47.     Section 11.1 of the Payment Agent Agreement provides that Zenith will retain title to the ownership of all property purchased under the Payment Agent Agreement until all outstanding amounts under the Payment Agent Agreement are paid in full to Zenith:

170421133

Seller hereby retains and reserves title to, ownership of, property in the Goods, and all attachments and accessories now or hereafter affixed thereto or used in connection therewith, and all proceeds therefrom, until all amounts due to Seller are paid in full pursuant to the final Sales Contract executed in connection with this Agreement. *Id*. at § 11.1.

## B.     The Letter Agreement

48.     On the same day that TGC and Zenith entered into the Payment Agent Agreement, they also entered into a separate letter agreement.[10]  The Letter Agreement provided that, pursuant to the Payment Agent Agreement, Zenith would "finance[e] or act[] as the payment agent for certain accounts payable of [TGC], including, without limitation, accounts payable owed by [TGC] to Storbyte, Inc." Exhibit J.  Once again, the conditions of repayment were expressly provided for in the Letter Agreement:

> By this letter . . . [TGC] agrees to remit all payments in respect of [Storbyte, Inc.] without setoff, discount or counterclaim against Zenith, directly to Zenith in United States dollars at the following remittance address and hereby expressly waives any such claims against Zenith either with respect to payment obligations or any warranty or satisfaction with the product purchased and sold pursuant to the Sale Transaction and related documentation . . . [TGC's] rights of setoff, discount, and counterclaim against Zenith are expressly waived hereunder. *Id.*

## C.     The Guaranty

49.     Along with the execution of the Payment Agent Agreement and the Letter Agreement, Grieg executed the Guaranty.  Pursuant to the Guaranty, Greig "unconditionally guarantees the full and prompt payment to ZENITH when due (whether at maturity, by acceleration or otherwise, and at all times thereafter) of all obligations, indebtedness and liabilities of every kind and nature of [TGC] to ZENITH arising under the [Payment Agent Agreement], all invoices issued by ZENITH to [TGC], all related purchase orders and any other document or

---

[10] A copy of the Letter Agreement is attached hereto as Exhibit J.

170421133

instrument executed by [TGC] in connection with the [Payment Agent Agreement] or any other transaction between ZENITH and [TGC] (collectively, the 'Other Documents')."  Exhibit K, at 1.

50.     "Guaranteed Obligations" are defined under the Guaranty as:

all said obligations, indebtedness, performance obligations and liabilities of [TGC] to ZENITH . . . including without limit, all amounts due under each invoice, late charges, administration fees, reserves, indemnity payments, and all other fees and sums of every kind and nature now or hereafter payable by [TGC] to ZENITH under the [Payment Agent Agreement] and the Other Documents.  *Id.*

51.     The Guaranty also included a provision regarding Greig's payment of costs and expenses incurred or paid by Zenith in collecting outstanding amounts and enforcing the Guaranty:

Guarantor further agrees to pay all costs and expenses (including court costs and attorneys' fees), paid or incurred by ZENITH in endeavoring to collect such indebtedness, obligations, payment obligations and liabilities, or any part thereof, and to enforce this Guaranty or in defending any suit based on any act of commission or omission of ZENITH with respect to any of the aforesaid indebtedness, obligations, payment obligations or liabilities, or any collateral therefor, or this Guaranty.  *Id.*

52.     Greig further agreed that "[i]n order to proceed to enforce this Guaranty and hold the Guarantor liable hereunder, there shall be no obligation on the part of ZENITH, at any time, to resort for payment to the [TGC] or any other Person, or to any collateral, security, property, liens or other rights or remedies whatsoever, all of which are hereby expressly waived by the Guarantor."  *Id.* at 2.

53.     Additionally, the terms of the Guaranty expressly permitted Zenith to assign the Guaranteed Obligations "without notice to anyone":

ZENITH may, without notice to anyone, sell or assign the Guaranteed Obligations, or any part thereof, or grant participations therein, and in any such event each and every immediate or remote assignee or holder of, or participant in, all or any of the Guaranteed Obligations shall have the right to enforce this Guaranty, by suit or otherwise for his benefit, as fully as if herein by name specifically given such right . . . .  *Id.* at 3–4.

**D.      The Assignment and Transfer Agreement**

54.      On September 30, 2019, Highmore and Zenith entered into a certain Assignment and Transfer Agreement.[11]    Pursuant to the Assignment and Transfer Agreement, Zenith irrevocably assigned its undivided interest in the Payment Agent Agreement to Highmore.  With the execution of the Assignment and Transfer Agreement, Highmore also acquired the right to enforce the Guaranty with respect to the Guaranteed Obligations.   While the Payment Agent Agreement and the Guaranty were wholly assigned to Highmore, after such assignment, Zenith continued to act as Highmore's agent to assist in administering the agreements.   Accordingly, references herein to Highmore in connection with the administration of the Assignment and Transfer Agreement and the Guaranty may also include Zenith as Highmore's agent.

55.      Pursuant to the agreements described above, Highmore evaluated TGC's request for financing utilizing the financial information supplied by TGC, which Highmore did not know at the time, but later learned through investigation and upon information and belief, contained inflated and false information.  Highmore conveyed that it was prepared to issue financing to TGC based on the financial information available to Highmore at the time.  Then, Euler Hermes, which held itself out to be the world's leading provider of trade-related insurance solutions, evaluated the same financial information supplied by TGC also without knowing at the time that it contained inflated and false information and issued a $5,000,000 insurance policy to FF Supply, Inc. in which Highmore is listed as the insured entity.   While Highmore conducted its own extensive due diligence, the fact that Euler Hermes evaluated the same financial information and approved coverage provided Highmore with added comfort.   As such, Highmore committed to issuing $5,000,000 in supplier credit financing to TGC.

---

[11] The Assignment and Transfer Agreement is attached hereto as Exhibit N.

### E.      The Device Partner Agreement

56.      On December 8, 2019, Datassure and PayRange entered into a certain Device Partner Agreement in which Datassure agreed to purchase at least one million BluKey devices from PayRange for a price of $62.50 per device plus tax and shipping (the "Device Partner Agreement").[12]  The Device Partner Agreement provided that PayRange would pay a partner share to Datassure of $71.74 per purchased device and upon payment of that partner share have the option to buy back the purchased devices from Datassure at a price of $1 per device.  On August 18, 2020, Datassure and PayRange entered into an amendment to the Device Partner Agreement.[13]

57.      PayRange advertises the same BluKey devices for sale on its website at a price of $15 per device, even for single purchases.  Upon information and belief, PayRange knew that Datassure did not have the financial ability to purchase $62,000,000 in equipment at the time the Device Partner Agreement was executed.  Rather, PayRange and Datassure entered into this commercially unreasonable and impossible transaction to facilitate the fraudulent scheme against Highmore.  In turn, PayRange was paid and accepted more than $5,000,000 from Highmore's funds for the purchase of 75,000 devices that actually cost a small fraction of the amount that PayRange collected.

### III.      TGC Submits Financing Requests to Highmore Using Falsified Invoices and Disburses Portions of the Loans to Datassure in Breach of the Agreements

### A.      The September 30, 2019 Financing Transaction

58.      In or about September 2019, TGC submitted a financing request to Highmore for the purchase of computer equipment from Storbyte that would be delivered to TGC's affiliate, Datassure, to facilitate installation and hosting for TGC's benefit.

---

[12] The Device Partner Agreement is attached hereto as Exhibit AB.

[13] The amendment to the Device Partner Agreement is attached hereto as Exhibit AQ.

170421133

59.     In support of TGC's financing requests, Sparrow, on behalf of TGC, sent Highmore via email an invoice purportedly from Storbyte, dated September 12, 2019, listing and describing equipment sold to TGC that would be shipped to TGC and Datassure (the "September 12, 2019 Storbyte Invoice").  The total amount due for the equipment was listed as $3,017,000, including tax.[14]  The September 12, 2019 Storbyte Invoice had the initials "DL" on it.  Upon information and belief, and as confirmed by Groenke, these initials represent Lauffin, who held himself out as an employee and agent of Storbyte with Storbyte's knowledge and consent.  Upon information and belief, Lauffin either prepared this invoice or assisted Greig in preparing it.  Also, upon information and belief, Lauffin spoke with Zenith by telephone regarding the invoices and purchase.  These calls served as supplier verification by Zenith on behalf of Highmore.  Storbyte, Lauffin and Groenke knew or should have known that any documents and information it provided to Zenith would be shared with Highmore to review as the lender.  Furthermore, TGC never could have submitted the fraudulent Storbyte invoices in support of this and the other transactions described herein without the assistance of Storbyte either supplying a blank invoice or providing the fraudulent version.

60.     TGC also sent Highmore a TGC purchase order dated September 11, 2019 listing the hardware storage equipment being purchased from Storbyte ("September 11, 2019 TGC Purchase Order").  The total amount due for the purchase was $2,800,000, which excluded the tax amount listed on the September 12, 2019 Storbyte Invoice.[15]

61.     On September 26, 2019, Highmore issued an invoice to TGC for the equipment referenced in the September 12, 2019 Storbyte Invoice and a wire fee, noting that the invoice is

---

[14] A copy of the September 12, 2019 Storbyte Invoice is attached hereto as Exhibit G.

[15] A copy of the September 11, 2019 TGC Purchase Order is attached hereto as Exhibit F.

170421133

subject to the Payment Agent Agreement ("September 26, 2019 Zenith Invoice").  The balance due from TGC was $3,077,360 and the due date was October 26, 3019.[16]  The September 26, 2019 Zenith Invoice also included the agreed-upon late fee charge of two percent per month if the invoice was not paid within three days of the invoice date pursuant to Section 3.4 of the Payment Agent Agreement.

62.     Highmore reviewed and relied upon the September 12, 2019 Storbyte Invoice and September 11, 2019 TGC Purchase Order in determining whether to approve TGC's financing request.  On September 30, 2019, Highmore approved the request.

63.     TGC, Storbyte, and Datassure retained Equinox to serve as an escrow agent to receive and distribute the funds in connection with the transactions contemplated by the Payment Agent Agreement.  Upon information and belief, Equinox had a pre-existing attorney client relationship with Greig, TGC, and Datassure.  Greig hand selected Equinox to serve as the escrow agent here to ultimately facilitate the improper and fraudulent disbursement of funds to himself, TGC, Datassure, Storbyte, and Equinox, as further detailed below.  In turn, Equinox accepted the role of escrow agent despite a clear conflict of interest, which was at no time disclosed to either Highmore or to Zenith.  Moreover, upon information and belief, Equinox was paid in excess of $150,000 for providing purely administerial services.  Upon information and belief, the excessive fees were paid to Equinox to compensate Equinox and Harju for their roles in effectuating the improper and fraudulent disbursements in contravention of the Escrow Agreements.  Harju and Equinox aided and abetted the misappropriation, fraud, embezzlement and laundering carried out by the enterprise.

---

[16] A copy of the September 26, 2019 Zenith Invoice is attached hereto as Exhibit M.

64.    On September 20, 2019 TGC, Storbyte, and Datassure entered into an escrow agreement (the "September 20, 2019 Escrow Agreement") in which Zenith is listed as the Lender, to facilitate TGC's alleged purchase of certain goods from Storbyte and Highmore's financing of the same.  As the listed lender, Highmore was an intended third party beneficiary of the September 20, 2019 Escrow Agreement.  On or about September 24, 2019, Harju sent the executed Escrow Agreement to Greig, Reifler, and Dan Casey of Zenith.[17]  Equinox and Harju knew or should have known that any documents and information they provided to Zenith would be shared with Highmore to review as the lender.

65.    The September 20, 2019 Escrow Agreement was executed by Lauffin on behalf of Storbyte, Greig on behalf of TGC, and Sparrow on behalf of Datassure.  It  was not executed on behalf of Equinox, although Harju emailed the agreement to Zenith and Highmore subsequently requested a copy including a signature on behalf of Equinox.

66.    The September 20, 2019 Escrow Agreement provided:

In connection with Purchase Order No. 12537 dated September 11, 2019, issued by TGC to StorByte in the amount of $2,800,000.00 plus applicable sales tax of $217,000.00, for a total of $3,017,000.00 . . . StorByte, TGC and Datassure have agreed, and hereby direct, that TGC's funds in the amount of $3,000,000.00 . . . be paid to Escrow Agent in a non-interest bearing account.  . . .  The Parties further agree that an additional amount of $5,000,000.00 . . . be paid to Escrow Agent in a non-interest bearing account on or about October 20, 2019 in connection with additional purchase orders issued to StorByte . . . No funds shall be disbursed without the written permission of all Parties to this Agreement or their attorneys. In the event of any disagreement hereunder, or in the absence of any written instructions, Escrow Agent may retain the Escrowed Funds pending written instructions mutually given or, in the sole discretion of Escrow Agent. Ex. L, at 3.

---

[17] A copy of the September 24, 2019 correspondence and the attached September 20, 2019 Escrow Agreement is attached hereto as Exhibit L.

67.     By signing the September 20, 2019 Escrow Agreement and the other escrow agreements described herein, Storbyte knew that the wired funds from Highmore for each of the relevant transactions were based on Storbyte's fraudulent invoices that contained inflated prices—and, in some cases, PayRange equipment that was not even sold by Storbyte—and Storbyte was essentially signing off on those invoices.

68.     Pursuant to TGC, Datassure and Storbyte's arrangement with Equinox and the September 20, 2019 Escrow Agreement, Highmore's sole obligation was to fund the escrow account.  Equinox was responsible for transferring the funds to Storbyte so that Storbyte could then deliver the equipment.  Upon Highmore funding the escrow account, it created a receivable in the amount of $3,017,000 plus interest.

69.     On September 30, 2019, Highmore wired $3,017,000 to Equinox in accordance with the September 20, 2019 Escrow Agreement for TGC to use in its entirety as payment to Storbyte for the purchased equipment.[18]

70.     However, unbeknownst to Highmore at the time, and later discovered through investigation, on September 20, 2019, Storbyte, Datassure and TGC instructed Equinox in a letter with the subject line "Escrow Disbursement Instructions, Escrow Agreement dated September 20, 2019" to disburse the incoming $3,000,000 wire as follows on September 23, 2019: 1) $64,448.37 to Equinox for "Billings" and "Retainer"; 2) $980,711.60 to Storbyte for "Sales Tax" and "Hardware"; 3) $1,954,790.03 to Datassure with no explanation; and 4) $50 for "Bank Fees." Greig executed the letter on behalf of TGC, Diamond Lauffin executed the letter on behalf of Storbyte and, upon information and belief, Sparrow executed the letter on behalf of Datassure.[19]

---

[18] A copy of the September 30, 2019 wire confirmation is attached hereto as Exhibit O.

[19] A copy of the September 20, 2019 Escrow Disbursement Instructions Letter is attached hereto as Exhibit H.

170421133

71.     Because TGC, Greig, Storbyte, Lauffin, Datassure, and Sparrow were all parties to the September 20, 2019 Escrow Agreement and the other escrow agreements described herein, they each knew or should have known that the instructions provided in the disbursement letters were in contravention to the applicable invoices and escrow agreements related to each transaction described herein.  By signing such disbursement instructions, Storbyte affirmed that payment for the purchased equipment subject to each transaction and delivery of the same were being completed.

72.     Harju, who personally transmitted the September 20, 2019 Escrow Agreement, was fully aware that the escrow release instructions did not conform to the invoices referenced therein. Harju was also copied on an email from Equinox's Director of Operations, Kelly Svihus, dated October 1, 2019, in which Svihus confirmed receipt of the $3,017,000 wire.[20]

73.     While the wired funds from Highmore were disbursed in contravention of the Payment Agent Agreement and applicable invoices, Datassure, TGC's affiliate, did use a portion of the funds to purchase the Storbyte equipment.  Upon information and belief, the amount used for this purpose reflects the actual value of the purchased equipment as opposed to the inflated price listed on the invoices submitted to Highmore.

**B.     The October 4, 2019 Financing Transaction**

74.     On or about October 2, 2019, TGC submitted another financing request to Highmore for the purchase of computer equipment from Storbyte that would be delivered to its affiliate, Datassure, to facilitate installation and hosting for TGC's benefit.

75.     In support of TGC's financing request, Sparrow, on behalf of TGC, sent to Highmore via email, cc'ing Lauffin and Greig, an invoice from Storbyte dated  October 1, 2019,

---

[20] A copy of the October 1, 2019 correspondence is attached hereto as Exhibit P.

listing and describing equipment sold to TGC that would be shipped to Datassure (the "October 1, 2019 Storbyte Invoice").  The total amount due for the equipment was $1,105,515, including tax.[21] The October 1, 2019 Storbyte Invoice had the initials "DL" on it.  Upon information and belief, these initials represent Lauffin, who held himself out as an employee and agent of Storbyte with Storbyte's knowledge and consent.  Upon information and belief, Lauffin either prepared this invoice or assisted Greig in preparing it.

76.     In that same email, Sparrow also sent Highmore a TGC purchase order dated October 1, 2019, listing the hardware storage equipment being purchased from Storbyte ("October 1, 2019 TGC Purchase Order").  The total amount due for the purchase was $1,026,000, which excluded the tax amount listed on the October 1, 2019 Storbyte Invoice.[22]  The October 1, 2019 TGC Purchase Order was signed by Greig.

77.     On October 2, 2019, Highmore issued an invoice to TGC for the equipment referenced in the October 1, 2019 Storbyte Invoice and a wire fee, noting that the invoice was subject to the Payment Agent Agreement ("October 2, 2019 Zenith Invoice").  The balance due from TGC was $1,127,645.30 and the due date was October 26, 2019.[23]  The October 2, 2019 Zenith Invoice also included the agreed-upon late fee charge of two percent per month if the invoice was not paid within three days of the invoice date pursuant to Section 3.4 of the Payment Agent Agreement.

78.     Highmore reviewed and relied upon the October 1, 2019 Storbyte Invoice and October 1, 2019 TGC Purchase Order in determining whether to approve TGC's financing request.  On October 4, 2019, Highmore approved the request.

---

[21] A copy of the October 1, 2019 Storbyte Invoice is attached hereto as Exhibit Q.

[22] A copy of the October 1, 2019 TGC Purchase Order is attached hereto as Exhibit R.

[23] A copy of the October 2, 2019 Zenith Invoice is attached hereto as Exhibit S.

170421133

79.     Upon information and belief, in October 2019 TGC, Storbyte, and Datassure entered into an escrow agreement (the "October 2019 Escrow Agreement"), in which Zenith is listed as the lender, to facilitate TGC's alleged purchase of certain goods from Storbyte and Highmore's financing of the same.  Upon information and belief, as the listed lender, Highmore was an intended third party beneficiary of the October 2019 Escrow Agreement.

80.     Pursuant to TGC, Datassure and Storbyte's arrangement with Equinox and the October 2019 Escrow Agreement, Highmore's sole obligation was to fund the escrow account. Equinox was responsible for transferring the funds to Storbyte so that Storbyte could then deliver the equipment.  Upon Highmore funding the escrow account, it created a receivable in the amount of $1,105,515 plus interest.

81.     On October 4, 2019, Highmore wired $1,105,515 to Equinox in accordance with the October 2019 Escrow Agreement for TGC to use in its entirety as payment to Storbyte for the purchased equipment.[24]

82.     However, unbeknownst to Highmore at the time, and upon information and belief, Storbyte, Datassure and TGC instructed Equinox to disburse the October 4, 2019 wire from Highmore in a manner inconsistent with the Payment Agent Agreement, October 1, 2019 Storbyte Invoice, October 1, 2019 TGC Purchase Order, and October 2019 Escrow Agreement.

83.     Once again, upon information and belief, Harju was aware that the escrow release instructions did not conform to the invoices referenced in the October 2019 Escrow Agreement. Moreover, Harju confirmed receipt of the transfer via email on October 7, 2019.[25]

---

[24] A copy of the October 4, 2019 wire confirmation is attached hereto as Exhibit T.

[25] A copy of the October 7, 2019 correspondence is attached hereto as Exhibit U.

170421133

84.     While the wired funds from Highmore were disbursed in contravention of the Payment Agent Agreement and applicable invoices, Datassure, TGC's affiliate, upon information and belief, did use a portion of the funds to purchase Storbyte equipment.  Upon information and belief, the amount used for this purpose reflects the actual value of the purchased equipment as opposed to the inflated price listed on the invoices submitted to Highmore.

**C.     TGC's Request for a Credit Line Increase from Highmore and Repayment of the September 2019 and October 2019 Transaction Loans**

85.     On or about October 11, 2019, Greig, on behalf of TGC, requested a credit line increase from $5,000,000 to $10,000,000 for TGC from Highmore.

86.     On or about October 11, 2019, Zenith submitted a request to Euler Hermes seeking to obtain an increase in the insured amount on the insurance policy issued by Euler Hermes to FF Supply, Inc. listing Highmore as the insured entity.

87.     On October 24, 2019, Reifler, on behalf of Zenith and Highmore, informed Sparrow and Greig via email that it was important to show compliance with the due date of October 26, 2019 for the September 2019 and October 2019 transactions while Zenith worked on the credit line increase with the insurance company.

88.     On October 28, 2019, after assessing TGC's creditworthiness and conducting due diligence, Euler Hermes approved an increase in the insured amount from $5,000,000 to $10,000,000 on the insurance policy listing Highmore as the insured entity.  Upon information and belief, Euler Hermes communicated directly with Greig and TGC during Euler Hermes's assessment of TGC.

170421133

89.     Datassure, for the benefit of its affiliate TGC, wired Highmore $3,000,000 on October 30, 2019,[26] and $1,205,005 on November 1, 2019,[27] as repayment in full for the loans issued by Highmore for the September 2019 and October 2019 transactions.

90.     While Highmore conducted its own extensive due diligence, the fact that Euler Hermes evaluated the same financial information and approved additional coverage provided Highmore with added comfort.  As such, Highmore committed to increase the supplier credit financing issued to TGC from $5,000,000 to $10,000,000.

**D.     The November 4, 2019 Financing Transaction**

91.     On or about November 1, 2019, Sparrow, on behalf of TGC, submitted another financing request to Highmore cc'ing Greig for the purchase of computer equipment from Storbyte that would be delivered to TGC's affiliate, Datassure, to facilitate installation and hosting for TGC's benefit.

92.     In support of TGC's financing request, TGC sent Highmore four invoices purportedly from Storbyte, dated November 4, 2019 and numbered DL2191104-1, DL2191104-2, DL2191104-3 and DL2191104-4, listing and describing equipment sold to TGC that would be shipped to Datassure (the "November 4, 2019 Storbyte Invoices").  The total amounts due for the equipment were $2,109,745, $2,211,030, $2,202,410 and $2,893,087.50, respectively, including tax.[28]  The November 4, 2019 Storbyte Invoices had the initials "DL" on them.  Upon information and belief, and as confirmed by Groenke, these initials represent Lauffin, who held himself out as an employee and agent of Storbyte with Storbyte's knowledge and consent.  Upon information and belief, Lauffin either prepared these invoices or assisted Greig in preparing them.

---

[26] A copy of the October 30, 2019 wire confirmation is attached hereto as Exhibit V.

[27] A copy of the November 1, 2019 wire confirmation is attached hereto as Exhibit W.

[28] Copies of the November 4, 2019 Storbyte Invoices are attached hereto as Exhibit X.

93.     Unbeknownst to Highmore at the time, and later discovered through investigation, and upon information and belief, the November 4, 2019 Storbyte Invoice numbered DL2191104-4 listed the purchase of PayRange equipment that Storbyte did not carry and at prices that were significantly inflated.

94.     TGC also sent Highmore four TGC purchase orders, dated November 4, 2019, listing the hardware storage equipment being purchased from Storbyte (the "November 4, 2019 TGC Purchase Orders").  The total amounts due for the purchases were $1,958,000, $2,052,000, $2,044,000 and $2,685,000, respectively, which excluded the tax amount listed on the November 4, 2019 Storbyte Invoices.[29]  The November 4, 2019 TGC Purchase Orders were signed by Greig.

95.     On November 4, 2019, Highmore issued four invoices to TGC for the equipment referenced in the November 4, 2019 Storbyte Invoices and a wire fee, noting that the invoices were subject to the Payment Agent Agreement (the "November 4, 2019 Zenith Invoices").  The balances due from TGC were $2,236,349.70, $2,343,691.80, $2,334,554.60 and $3,066,672.75, respectively, and the due dates were February 2, 2020.[30]  The November 4, 2019 Zenith Invoices also included the agreed-upon late fee charge of two percent per month if the invoice was not paid within three days of the invoice date pursuant to Section 3.4 of the Payment Agent Agreement.

96.     Highmore reviewed and relied upon the November 4, 2019 Storbyte Invoices and November 4, 2019 TGC Purchase Orders in determining whether to approve TGC's financing request.  On November 4, 2019, Highmore approved the request.

97.     Upon information and belief, in November 2019, TGC, Storbyte and Datassure entered into an escrow agreement (the "November 2019 Escrow Agreement"), in which Zenith

---

[29] Copies of the November 4, 2019 TGC Purchase Orders are attached hereto as Exhibit Y.

[30] Copies of the November 4, 2019 Zenith Invoices are attached hereto as Exhibit AA.

170421133

was listed as the lender, to facilitate TGC's alleged purchase of certain goods from Storbyte and Highmore's financing of the same.  Upon information and belief, as the listed lender, Highmore was an intended third party beneficiary of the November 2019 Escrow Agreement.

98.    Pursuant to TGC, Datassure and Storbyte's arrangement with Equinox and the November 2019 Escrow Agreement, Highmore's sole obligation was to fund the escrow account. Equinox was responsible for transferring the funds to Storbyte so that Storbyte could then deliver the equipment.  Upon Highmore funding the escrow account, it created a receivable in the amount of $9,416,272.50 plus interest.

99.    On November 4, 2019, Highmore wired $9,416,272.50 to Equinox in accordance with the November 2019 Escrow Agreement for TGC to use in its entirety as payment to Storbyte for the purchased equipment.[31]

100.    However, upon information and belief, and unbeknownst to Highmore at the time, and later discovered through investigation, Storbyte, Datassure and TGC instructed Equinox to distribute the wired funds among themselves in contravention with the Payment Agent Agreement, the November 2019 Escrow Agreement and the invoices.

101.    While the wired funds from Highmore were disbursed in contravention of the Payment Agent Agreement and applicable invoices, Datassure, TGC's affiliate, upon information and belief did use a portion of the funds to purchase Storbyte and PayRange equipment.  Upon information and belief, the amount used for this purpose reflects the actual value of the purchased equipment as opposed to the inflated price listed on the invoices submitted to Highmore.

---

[31] A copy of the November 4, 2019 wire confirmation is attached hereto as Exhibit Z.

E.      **TGC's Request for a Credit Line Increase from Highmore**

102.    In or about December 2019, TGC requested an increase in supplier credit financing from $10,000,000 to $20,000,000 from Highmore.

103.    On or about December 20, 2019, Zenith submitted a request to Euler Hermes for an increase in the insured amount on the insurance policy issued by Euler Hermes to FF Supply, Inc., listing Highmore as the insured entity.

104.    On December 20, 2019, after assessing TGC's creditworthiness and conducting due diligence, Euler Hermes approved a temporary increase in the insured amount on the insurance policy from $10,000,000 to $20,000,000, with the temporary increase to expire on February 28, 2020.  Upon information and belief, Euler Hermes communicated directly with Greig and TGC during Euler Hermes's assessment of TGC.

105.    While Highmore conducted its own extensive due diligence, the fact that Euler Hermes evaluated the same financial information and approved additional coverage provided Highmore with added comfort.  As such, Highmore committed to increase the supplier credit financing issued to TGC from $10,000,000 to $20,000,000.

F.      **The January 17, 2020 Financing Transaction**

106.    On or about January 13, 2020, TGC submitted another financing request to Highmore for the purchase of computer equipment from Storbyte that would be delivered to TGC's affiliate, Datassure, to facilitate installation and hosting for TGC's benefit.

107.    In support of TGC's financing request, TGC presented Zenith with two invoices purportedly issued by Storbyte, dated January 13, 2020 and numbered DL2200113-1 and DL2200113-2, listing and describing equipment sold to TGC that would be shipped to Datassure (the "January 13, 2020 Storbyte Invoices").  The total amounts due for the equipment were

$5,204,325 and $452,550, respectively, including tax.[32]  The January 13, 2020 Storbyte Invoices had the initials "DL" on them.  Upon information and belief, and as confirmed by Groenke, these initials represent Lauffin, who held himself out as an employee and agent of Storbyte with Storbyte's knowledge and consent.  Upon information and belief, Lauffin either prepared these invoices or assisted Greig in preparing them.

108.    Unbeknownst to Highmore at the time, and later discovered through investigation, and upon information and belief, the January 13, 2020 Storbyte Invoices listed the purchase of PayRange equipment that Storbyte did not carry and at prices that were significantly inflated.

109.    TGC also sent Highmore two TGC purchase orders, dated January 13, 2020, listing the hardware storage equipment being purchased from Storbyte (the "January 13, 2020 TGC Purchase Orders").  The total amounts due for the purchases were $4,830,000 and $420,000, respectively, which excluded the tax amount listed on the January 13, 2020 Storbyte Invoices.[33] The January 13, 2020 TGC Purchase Orders were signed by Greig.

110.    On January 13, 2020, Highmore issued two invoices to TGC for the equipment referenced in the January 13, 2020 Storbyte Invoices and a wire fee, noting that the invoices are subject to the Payment Agent Agreement (the "January 13, 2020 Zenith Invoices").  The balances due from TGC were $5,620,691 and $488,774, respectively, and the due dates were May 12, 2020.[34]  The January 13, 2020 Zenith Invoices also included the agreed-upon late fee charge of two percent per month if the invoice was not paid within three days of the invoice date pursuant to Section 3.4 of the Payment Agent Agreement.

---

[32] Copies of the January 13, 2020 Storbyte Invoices are attached hereto as Exhibit AD.

[33] Copies of the January 13, 2020 TGC Purchase Orders are attached hereto as Exhibit AF.

[34] Copies of the January 13, 2020 Zenith Invoices are attached hereto as Exhibit AE.

170421133

111.    Highmore reviewed and relied upon the January 13, 2020 Storbyte Invoices and January 13, 2020 TGC Purchase Orders in determining whether to approve TGC's financing request.  On January 13, 2020, Highmore approved the request.

112.    On January 17, 2020, TGC, Storbyte and Datassure entered into an escrow agreement (the "January 17, 2020 Escrow Agreement"), in which Zenith is listed as the lender, to facilitate TGC's alleged purchase of certain goods from Storbyte and Highmore's financing of the same.[35]  As the listed lender, Highmore was an intended third party beneficiary of the January 17, 2020 Escrow Agreement.

113.    Pursuant to TGC, Datassure and Storbyte's arrangement with Equinox and the January 17, 2020 Escrow Agreement, Highmore's sole obligation was to fund the escrow account. Equinox was responsible for transferring the funds to Storbyte so that Storbyte could then deliver the equipment.  Upon Highmore funding the escrow account, it created a receivable in the amount of $5,656,875 plus interest.

114.    The January 17, 2020 Escrow Agreement was executed by Lauffin on behalf of Storbyte, Greig on behalf of TGC, Sparrow on behalf of Datassure, and Harju on behalf of Equinox.  Sparrow emailed a copy of the agreement to Zenith on January 17, 2020.

115.    The January 17, 2020 Escrow Agreement provided:

In connection with StorByte's Invoice Nos. 2200113–1 and 2200113–2, dated January 13, 2020, issued by StorByte to TGC in the amount of $5,656,875.00 . . . StorByte, TGC and Datassure have agreed, and hereby direct, that TGC's funds in the amount of: $5,656,875.00 . . . be paid to Escrow Agent in a non-interest bearing account.  The Parties further agree that any additional amounts from Lender be paid to Escrow Agent in a non-interest bearing account in connection with subsequent invoices issued to StorByte.  . . .  No funds shall be disbursed without the written permission of all Parties to this Agreement or their attorneys.  In the event of any

---

[35] A copy of the January 17, 2020 correspondence and the attached January 17, 2020 Escrow Agreement is attached hereto as Exhibit AH.

disagreement hereunder, or in the absence of any written instructions, Escrow Agent may retain the Escrowed Funds pending written instructions mutually given or, in the sole discretion of Escrow Agent. Exhibit AH, at 1.

116. The January 17, 2020 Escrow Agreement identified Zenith as the Lender and Equinox as the Escrow Agent.

117. On January 17, 2020, Highmore wired $5,656,875 to Equinox in accordance with the January 17, 2020 Escrow Agreement for TGC to use in its entirety as payment to Storbyte for the purchased equipment.[36]

118. However, unbeknownst to Highmore at the time, and later discovered through investigation, on January 17, 2020, Storbyte, Datassure and TGC instructed Equinox in a letter to disburse the incoming $5,656,875 wire as follows on January 20, 2020: 1) $50,000 to Equinox as a "Retainer"; 2) $5,606,830 to Datassure without explanation; and 3) $45 in "Bank Fees."[37] Once again, Harju was aware that the escrow release instructions did not conform to the invoices referenced in the January 17, 2020 Escrow Agreement.

119. While the wired funds from Highmore were disbursed in contravention of the Payment Agent Agreement, the January 17, 2020 Escrow Agreement and the applicable invoices, Datassure, TGC's affiliate, did use a portion of the funds to purchase Storbyte and PayRange equipment. Upon information and belief, the amount used for this purpose reflects the actual value of the purchased equipment as opposed to the inflated price listed on the invoices submitted to Highmore.

---

[36] A copy of the January 17, 2020 wire confirmation is attached hereto as Exhibit AI.

[37] A copy of the January 17, 2020 Escrow Disbursement Instructions Letter is attached hereto as Exhibit AG.

170421133

### G.    TGC's Repayment of the November 2019 Transaction Loans

120.    On January 23, 2020, Datassure, for the benefit of its affiliate TGC, wired Highmore $9,981,268.85 to repay the loan for the November 2019 transaction.[38]

### H.    The January 31, 2020 Financing Transaction

121.    On or about January 29, 2020, TGC submitted another financing request to Highmore for the purchase of computer equipment from Storbyte that would be delivered to TGC's affiliate, Datassure, to facilitate installation and hosting for TGC's benefit.

122.    In support of TGC's financing request, TGC presented Zenith with two invoices purportedly issued by Storbyte, dated January 29, 2020 and numbered DL2200129-1 and DL2200129-2, listing and describing equipment sold to TGC that would be shipped to Datassure (the "January 29, 2020 Storbyte Invoices").   The total amounts due for the equipment were $6,986,126 and $5,833,364.80, respectively, including tax.[39]   The January 29, 2020 Storbyte Invoices had the initials "DL" on them.   Upon information and belief, these initials represent Lauffin, who held himself out as an employee and agent of Storbyte with Storbyte's knowledge and consent.   Upon information and belief, Lauffin either prepared these invoices or assisted Greig in preparing them.

123.    TGC also sent Highmore two TGC purchase orders, dated January 29, 2020, listing the hardware storage equipment being purchased from Storbyte (the "January 29, 2020 TGC Purchase Orders").   The total amounts due for the purchases were $6,986,126 and $5,833,364, respectively.[40]   The January 29, 2020 TGC Purchase Orders were signed by Greig.

---

[38] A copy of the January 23, 2020 wire confirmation is attached hereto as Exhibit AJ.

[39] Copies of the January 29, 2020 Storbyte Invoices are attached hereto as Exhibit AK.

[40] Copies of the January 29, 2020 TGC Purchase Orders are attached hereto as Exhibit AL.

170421133

124.    On January 31, 2020, Highmore issued two invoices to TGC for the equipment referenced in the January 29, 2020 Storbyte Invoices and a wire fee, noting that the invoices were subject to the Payment Agent Agreement (the "January 31, 2020 Zenith Invoices").  The balances due from TGC were $7,545,036.08 and $6,300,033.98, respectively, and the due dates were May 30, 2020.[41]  The January 31, 2020 Zenith Invoices also included the agreed-upon late fee charge of two percent per month if the invoice was not paid within three days of the invoice date pursuant to Section 3.4 of the Payment Agent Agreement.

125.    Highmore reviewed and relied upon the January 29, 2020 Storbyte Invoices and January 29, 2020 TGC Purchase Orders in determining whether to approve TGC's financing request.  On January 31, 2020, Highmore approved the request.

126.    On January 30, 2020, TGC, Storbyte, and Datassure entered into another escrow agreement (the "January 30, 2020 Escrow Agreement"), in which Zenith is listed as the lender, to facilitate the transfer of funds in connection with additional invoices purportedly issued by Storbyte.[42]  As the listed lender, Highmore was an intended third party beneficiary of the January 30, 2020 Escrow Agreement.

127.    The January 30, 2020 Escrow Agreement was executed by Lauffin on behalf of Storbyte, Greig on behalf of TGC, Sparrow on behalf of Datassure, and Harju on behalf of Equinox.

128.    The January 30, 2020 Escrow Agreement provided:

In connection with StorByte's Invoice Nos. 2200129-1 and 2200129-2, dated January 29, 2020, issued by StorByte to TGC in the total amount of $12,819,490.80 . . . StorByte, TGC and Datassure have agreed, and hereby direct, that TGC's funds in the amount of $12,819,490.80 . . . be paid to Escrow Agent in a non-interest

---

[41] Copies of the January 31, 2020 Zenith Invoices are attached hereto as Exhibit AN.

[42] A copy of the January 31, 2020 correspondence and the attached January 30, 2020 Escrow Agreement is attached hereto as Exhibit AO.

bearing account.  The Parties further agree that any additional amounts from Lender be paid to Escrow Agent in a non-interest bearing account in connection with subsequent invoices issued to StorByte. . . . No funds shall be disbursed without the written permission of all Parties to this Agreement or their attorneys.  In the event of any disagreement hereunder, or in the absence of any written instructions, Escrow Agent may retain the Escrowed Funds pending written instructions mutually given or, in the sole discretion of Escrow Agent.  Exhibit AO, at 1.

129.    The January 30, 2020 Escrow Agreement once again identified Zenith as the Lender and Equinox as the Escrow Agent.

130.    Pursuant to TGC, Datassure and Storbyte's arrangement with Equinox and the January 30, 2020 Escrow Agreement, Highmore's sole obligation was to fund the escrow account. Equinox was responsible for transferring the funds to Storbyte so that Storbyte could then deliver the equipment.  Upon Highmore funding the escrow account, it created a receivable in the amount of $12,819,490.80 plus interest.

131.    On January 31, 2020, Highmore wired $12,819,490.80 to Equinox in accordance with the January 30, 2020 Escrow Agreement for TGC to use in its entirety as payment to Storbyte for the purchased equipment.[43]

132.    However, unbeknownst to Highmore at the time, and later discovered through investigation, on January 30, 2020, Storbyte, Datassure and TGC instructed Equinox in a letter to disburse the incoming $12,819,490.80 wire as follows on February 3, 2020: 1) $1,000,000 to Equinox/TGC without explanation; 2) $1,476,249.06 to Storbyte without explanation; 3) $10,343,166.74 to Datassure without explanation; and 4) $75 in "Bank Fees."[44]  Once again, Harju was aware that the escrow release instructions did not conform to the invoices referenced in the January 30, 2020 Escrow Agreement.

---

[43] A copy of the January 31, 2020 wire confirmation is attached hereto as Exhibit AP.

[44] A copy of the January 30, 2020 Escrow Disbursement Instructions Letter is attached hereto as Exhibit AM.

133.    While the wired funds from Highmore were disbursed in contravention of the Payment Agent Agreement, the January 30, 2020 Escrow Agreement and the applicable invoices, Datassure, TGC's affiliate, did use a portion of the funds to purchase Storbyte and PayRange equipment.  Upon information and belief, the amount used for this purpose reflects the actual value of the purchased equipment as opposed to the inflated price listed on the invoices submitted to Highmore.

## IV.   TGC Fails to Repay the January 17 and January 31 Transactions, Thereby Breaching the Payment Agent Agreement

### A.     TGC's Failure to Repay Highmore for the January 17, 2020 Transaction

134.    Pursuant to the Payment Agent Agreement and the January 13, 2020 Zenith invoices, TGC was required to repay Highmore for the $5,656,875 financing it received as part of the January 17, 2020 transaction plus the agreed-upon late fee charge of two percent per month on or before May 12, 2020, if the invoice was not paid within three days of the invoice date.

135.    TGC defaulted and, to date, has not remitted the $5,656,875 to Highmore or the associated late and administrative fees.

### B.     TGC's Failure to Repay Highmore for the January 31, 2020 Transaction

136.    Pursuant to the Payment Agent Agreement and the January 31, 2020 Zenith invoices, TGC was required to repay Highmore for the $12,819,490.80 financing it received as part of the January 31, 2020 transaction plus the agreed-upon late fee charge of two percent per month on or before May 30, 2020, if the invoice was not paid within three days of the invoice date.

137.    TGC defaulted and, to date, has not remitted the $12,819,490.80 to Highmore or the associated late and administrative fees.

## V.   Highmore Consistently Attempts to Recover Payment from TGC and TGC and Greig Respond with False Representations and Falsified Documents and Correspondence, Prompting Highmore to Investigate

40

138.    Highmore is presently owed $19,954,515.07 for the January 2020 fundings, not including subsequent interest and late fees which continue to accrue.

139.    On a monthly basis since Highmore's January 2020 fundings, Highmore has generated and sent invoices to TGC reflecting the late fees accrued as of each 30-day period the balance has remained unpaid.

140.    From May 2020 to June 2021, Jogia, Beggin, and Reifler engaged in multiple meetings, discussions and correspondence with representatives and employees of TGC, including Greig, in an effort to recover payment for the January 17 and January 31 transactions.

141.    On or about May 20, 2020, Jogia, Reifler and Greig participated in a conference call to discuss TGC's default on the January 17, 2020 transaction balance.  Greig represented to Highmore that TGC was in the process of obtaining an asset-based lending facility from Iron Horse that would buy Highmore out of the debt owed.  Greig stated that the deal was expected to close in the following week.  TGC never obtained an asset-based lending facility from Iron Horse.

142.    On or about August 27, 2020, Beggin and Reifler visited the TGC and Datassure offices in Irvine, California to discuss repayment options with Greig.  Greig represented to Highmore that he had three separate repayment paths in the works, including 1) a small line of credit for Datassure that would allow TGC or Greig to make a $500,000 good faith payment toward the balance owed; 2) a Transunion overage that would allow TGC or Greig to make a $5,000,000 good faith payment toward the balance owed; and 3) a JP Morgan line of credit to TGC that was linked to the credit lines that TGC purportedly had in place with Lloyds Bank in the UK that would allow TGC to repay the entire amounts owed.  None of the three paths ever resulted in a deal for TGC or any payment toward the balance owed to Highmore.

143.    On or about October 6, 2020, Lereau sent Highmore a letter in which TGC acknowledged the principal amounts and late fees owed for the January 17 and January 31 transactions as of September 30, 2020.  The letter states, "The Company is currently in the process of undertaking a line of credit, domestically in the US, with which it intends to pay this debt." However, upon information and belief, no line of credit was obtained for this purpose.  Upon information and belief, Lereau is a fictitious person invented by Greig in order to perpetuate the fraudulent scheme.

144.    Greig, both on his own and through the fictious Lereau persona, made additional representations related to possible repayment paths involving lines of credit and interbank credit applications from, *inter alia*, JP Morgan Chase and Lloyds Bank on multiple occasions either in person or in correspondence on or about November 17, 2020; November 20, 2020; December 7, 2020; February 8, 2021; February 15, 2021; February 23, 2021; March 5, 2021; May 5, 2021; and May 20, 2021.

145.    On or about March 24, 2021, Jogia received a call from an individual claiming to be Abell, TGC's purported director.  The number from which Abell called was blocked.  During the call, Abell verbally acknowledged TGC's repayment obligation and stated that it was unfortunate that the wire was "sticky."  He assured Jogia that the obligation would be repaid.  In reality, upon information and belief, Abell is a fictitious person invented by Greig in order to perpetuate the fraudulent scheme, and, upon information and belief, Greig disguised his own voice during the call.

146.    In or about May 2021, Greig represented to Highmore that TGC was being purchased by Maersk, a member of the A.P. Moller Group.

170421133

147.    On or about May 5, 2021, Jogia sent a letter to Greig and Lereau at TGC requesting repayment of the outstanding balance by May 21, 2021 from TGC and, should that not be forthcoming, notification from the purported buyer of TGC by May 28, 2021.

148.    On or about May 4, 2021, Lereau purportedly sent Jogia and Reifler screenshots purporting to be from Lloyds Bank's link portal reflecting a pending wire for $24,466,688.06 to the First Republic Bank swift code and reflecting the status of the credit line.  Unbeknownst to Highmore at the time, and upon later discovery during an investigation, the screenshots were fabricated.

149.    On or about May 28, 2021, Lereau purportedly sent Jogia, Greig and Reifler a letter on Greig's letterhead stating that the obligation of TGC is still true and owing.  The letter was signed by Julia Van Den Hoogen, whom Greig represented was a Maersk employee.  Upon information and belief, Hoogen is a fictitious person invented by Greig in order to perpetuate the fraudulent scheme.  The letter also listed an address of "Esplanaden 50 1263, København K, Hovedstaden Denmark," which corresponds to a Maersk company address.  Unbeknownst to Highmore at the time, and upon later discovery during an investigation, on information and belief, the letter did not come from an employee of Maersk.

150.    On or about June 6, 2021, Jogia sent a second letter to TGC requesting formal notification from the purported buyer of TGC.

151.    On or about June 10, 2021, Jogia visited Greig at the Datassure offices in Irvine, California to discuss repayment of the balances owed, while other members of Highmore management joined the meeting by telephone.  Greig represented that he had 600,000 restricted Maersk B shares in his brokerage account, which corresponded to $1,700,000,000 in market

capital; however, he was unable to sell such shares until year-end as a result of a purchase agreement between TGC and Maersk.

152.    At the June 10, 2021 meeting, Jogia indicated that Highmore's preference was that TGC utilize Greig's Maersk shares to effect a restructuring of the loans to facilitate repayment and satisfaction of the financing amounts owed.  Unbeknownst to Highmore at the time, and upon later discovery during an investigation, no such shares existed.

153.    On or about June 17, 2021, Greig, Jogia, Beggin and another member of Highmore Management participated in a conference call to discuss the progress of the restructuring using the Maersk shares.  They discussed Highmore's need to receive verification of the Maersk shares to be pledged and Greig represented that his wealth manager, Jacob Nelson, would provide the verification.  Upon information and belief, Nelson is a fictitious person invented by Greig in order to perpetuate the fraudulent scheme.

154.    That same day, Greig purported to email Nelson with Jogia, Beggin and Jiang copied on the email.  Greig requested that Nelson provide an audit confirm to Highmore.  The email domain purportedly belonging to Nelson was "@britanniasecuritiesintl.com," and the email itself included the use of the Britannia logo and a disclaimer.  Unbeknownst to Highmore at the time and upon later discovery during an investigation, that email domain appears on a list of newly registered domains for the date of June 17, 2021, on https://www.thesiterank.com/newly-registered-domain-names-by-date/2021-06-17/3, and the domain is not associated with a website.

155.    On June 18, 2021, Nelson purportedly responded to Greig's June 17, 2021 email copying Jogia, Beggin and Jiang by attaching a draft audit confirm awaiting Greig's signature.  Greig then sent Jogia and Beggin a signed audit confirm via email.  Per the instructions on the confirm, Jogia sent the audit confirm signed by Greig to

"Audit.confirms@britanniasecuritiesintl.com." That same day, Beggin also submitted a request for instructions on the audit confirm process for Britannia Securities International, Ltd. via the "Contact us" website link for Brittania Global Markets.

156. On June 21, 2021, Beggin received an email from Dominic Bacon, the general counsel of Britannia Global Markets, stating that "Brittania Securities International, Ltd." was not affiliated with Brittania Global Markets. Beggin and Jogia called Bacon to further discuss his email response, and Bacon explained that he was general counsel for Brittania Global Markets and the holding company Brittania Financial Group. Bacon explicitly stated that neither Nelson nor Britannia Financial International, Ltd. was known to him or affiliated with the entities for which he worked. Bacon stated that either Highmore or a Highmore client might be subject to some kind of fraud.

157. That same day, Jogia received a countersigned audit confirm from "Audit.confirms@britanniasecuritiesintl.com" reflecting 600,000 Maersk B shares in the account, roughly equivalent to $1,700,000,000. Upon information and belief, Greig falsified the audit confirm, or caused the falsification of the audit confirm, in order to perpetuate the fraudulent scheme.

158. On or about June 22, 2021, Jogia and Beggin called Steve Schueler, the former Chief Commercial Officer of A.P. Moller Maersk, for information on how A.P. Moller operates in acquisitions of other companies. Jogia and Beggin described the transaction Greig conveyed to them, and Schueler stated that he found the manner of the purchase of TGC to be suspicious because it involved the use of Maersk B shares as opposed to cash. Schueler described the previous purchases with which he was familiar as involving cash, as the family that was the controlling shareholder did not want to dilute their ownership.

159.     On or about June 24, 2021, Greig, Jogia, Beggin and others met at the TGC and

Datassure offices in Irvine, California.  At the meeting, Highmore presented Greig with a demand

notice and made a formal demand for repayment.  Greig stated he understood the demand and

acknowledged TGC's repayment obligation.  Highmore also requested the return of all assets

purchased by TGC with the financing funds that were not repaid because, pursuant to the Payment

Agent Agreement, Highmore retained title to the assets.  Specifically, Highmore requested the

return of i) the PayRange devices and ii) the Storbyte servers.  Highmore also requested that Lereau

and Abell join the meeting.  Greig purportedly called them but stated he was unable to reach them.

160.     Greig responded that he did not know the location of the PayRange devices because

of a contractual dispute with PayRange, and Greig shared copies of the contracts between

Datassure and PayRange with Highmore.

161.     Greig also responded that two boxes of assets purchased from Storbyte were located

in Irvine and two others were located in Nevada.  The Highmore representatives left with the Irvine

boxes that day.

162.     Greig also disclosed that six server boxes were still in the possession of Storbyte

Inc. in Washington, DC, and that only two of those were owned by Highmore.  Greig called

Groenke at Storbyte during this meeting in front of the Highmore representatives.  During that

call, Groenke confirmed that Storbyte possessed the assets.

163.     On or about June 29, 2021, Jogia and Beggin met with Groenke in New York office.

Storbyte is not a large company, and even at the accurate prices of the equipment ordered as

opposed to the inflated prices on the Storbyte Invoices described above, the transactions relevant

to this action would have all been material transactions for Storbyte of which Storbyte management

would have been aware.  Groenke stated that he was not involved with the TGC transactions.  He

170421133

stated that Lauffin was the lead on the TGC transactions and Groenke became involved only after the equipment did not ship and Storbyte began making collection efforts on the money owed to Storbyte by TGC.  Groenke stated that while certain monies were paid to Storbyte by TGC, the payments were incomplete.  As a result, Groenke stated that Storbyte was still owed $480,000 by TGC and that Storbyte retained the six boxes in Storbyte's possession.

164.    During the meeting, Jogia and Beggin asked Groenke about Lauffin, who had signed all of the aforementioned escrow agreements on behalf of Storbyte.  Groenke stated that Lauffin was never an employee of Storbyte and was actually a reseller.  Groenke confirmed that Lauffin's initials, "DL," included at the beginning of each invoice number indicated that Lauffin was involved with the sale.

165.    Jogia and Beggin also showed Groenke the January 29, 2020 Storbyte Invoice, numbered DL2200129-1, which listed PayRange equipment purportedly purchased by TGC for $6,986,126.  Groenke reviewed the invoice and stated that Storbyte did not manufacture PayRange devices, meaning the invoice was inaccurate and falsified.

166.    Jogia and Beggin also showed Groenke the January 13, 2020 Storbyte Invoice numbered DL2200113-1, which listed equipment purportedly purchased by TGC for $5,204,325. Groenke reviewed the invoice and stated that the amounts on the invoice did not make sense because while the equipment listed was manufactured by Storbyte, the listed prices were too high.

167.    Groenke refused to provide information to Highmore about the devices purportedly purchased by Datassure and those retained by Storbyte and instead proffered a non-disclosure agreement and payment agreement to Highmore in an effort to further extort funds from Highmore. Indeed, on November 7, 2021, Groenke emailed Jogia requesting payment for the equipment and attached a biography for Lauffin.

168.    Upon information and belief, Lauffin held himself out as Storbyte's agent with Groenke and Storbyte's knowledge and consent and, as such, Storbyte is liable for his actions.  Storbyte is also liable on the theory of respondeat superior as Lauffin's employer.

## VI.    Greig Fails to Repay the January 17 and January 31 Transactions Owed by TGC, Thereby Breaching the Guaranty Agreement

169.    After TGC defaulted with respect to the January 17, 2020 transaction and the January 31, 2020 transaction, Jogia and Reifler engaged in multiple discussions with Greig with respect to the default and Greig's personal obligations pursuant to the Guaranty.

170.    Most recently, on July 12, 2021, Jogia, on behalf of Highmore, sent a letter (the "July 12, 2021 Demand Letter") to Greig demanding the full amount owed to Highmore under the Payment Agent Agreement.[45]  Jogia, on behalf of Highmore, also sent a letter to Greig, TGC, Datassure and Sparrow on June 24, 2021 (the "June 24, 2021 Demand Letter") demanding that TGC deliver the equipment purchased with Highmore's funding to Highmore pursuant to the Payment Agent Agreement.[46]

171.    Despite this, Greig has not remitted any portion of the balance owed for the January 17, 2020 and January 31, 2020 transactions totaling $19,954,515.07 owed to Highmore.

172.    On July 15, 2021, Highmore instituted a legal action against Greig in the Supreme Court of the State of New York for breach of the Guaranty.  *See Highmore Financing Co. I v. Greig*, Index No. 654386/2011 (N.Y. Sup., N.Y. Cty. 2021).

---

[45] A copy of the July 12, 2021 Demand Letter is attached hereto as Exhibit AS.

[46] A copy of the June 24, 2021 Demand Letter is attached hereto as Exhibit AR.

170421133

### VII.   Defendants' Personal Use of the Funds Fraudulently Redirected from the Escrow Account

173.   On information and belief, on December 31, 2019, Paul King, the Chief Strategy Officer of Datassure, recorded a deed for property purchased at 2045 Campo Verde, Escondido, CA 92026 under the name of a different corporation he co-manages.  Sparrow currently resides at that address.

174.   Since fraudulently redirecting the funds resulting from the January 17, 2020 and January 31, 2020 transactions, Greig and TGC have, upon information and belief, spent hundreds of thousands of dollars on luxury vehicles, including an Aston Martin, a Mercedes-Benz G Wagon, a second Mercedes sedan and a Tesla Model X.

175.   Upon information and belief, soon after the January 17, 2020 and January 31, 2020 transactions, Greig moved into an exclusive community in Newport Coast with an address of 24 Morning Light, Newport Coast, CA 92657 and rent of approximately $19,000 per month.  Also, upon information and belief, Greig moved into an even more exclusive community in Laguna Beach in early 2021 with an address of 40 Smithcliffs Road and rent of approximately $21,500 per month.  Upon information and belief, Greig also purchased an option on the property that would allow him to purchase the property at a discount to fair market value.

176.   In addition, TGC and Datassure rent office space at 2 Park Plaza, Irvine, CA 92614 for approximately $50,000 per month.  Upon information and belief, they are at least two months in arrears on this office space and the landlord, The Irvine Companies, is seeking eviction.

### LEGAL CAUSES OF ACTION

### COUNT I
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### 18 U.S.C. § 1961, *et seq.*
### (Against All Defendants)

170421133

177.    Highmore incorporates by reference the allegations in the preceding paragraphs of the Complaint as if they were fully restated.

178.    Highmore brings this Count on behalf of itself against the following Defendants: The Greig Companies, Inc., Jason Allen Greig, Datassure Corp., Jeffrey Sparrow, Equinox Business Law Group PLLC, Shawn Harju, Storbyte Inc., Diamond Lauffin, Steven Groenke and PayRange Inc.

179.    At all relevant times, Defendants were and are "persons" under 18 U.S.C. § 1961(3) because they are individuals and entities capable of holding, and do hold, "a legal or beneficial interest in property."

180.    Section 1962(c) of the RICO statute makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).

181.    The term "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  The definition of "enterprise" in Section 1961(4) includes legitimate and illegitimate enterprises within its scope.

182.    Defendants were each and all members of the same associated-in-fact enterprise, which was conspired and formed with the intent to defraud, embezzle and launder funds from Highmore for the benefit of Defendants.  Defendants conducted the affairs of the enterprise by engaging in a pattern of racketeering activities, including wire fraud and mail fraud, which had an effect on interstate commerce.  Each of the individuals and entities that formed the enterprise acted to enable the common purpose and fraudulent scheme of the enterprise.

50

183.   To carry out the enterprise's affairs and accomplish the common purpose, beginning on or about July 2019, Defendants worked together and carried out a pattern of fraudulent activity by engaging in three sequential steps, each of which involved smaller schemes designed to defraud Highmore through wire fraud and mail fraud.

184.   First, Defendants TGC, Greig, Datassure and Sparrow worked together to fraudulently obtain a line of credit from Highmore—and then obtain increases in that credit line and purport to rectify TGC's default—by systematically providing falsified and misappropriated business records and misinformation to Highmore via email and telephone.  Next, Defendants TGC, Greig, Sparrow, Storbyte, Lauffin, Groenke and PayRange worked together to embezzle and launder funds from Highmore by issuing fraudulent and inflated invoices and sending them via email to Highmore to induce Highmore to wire funds to Defendants.  Finally, Defendants TGC, Greig, Datassure, Sparrow, Storbyte, Lauffin, Groenke, Equinox and Harju worked together to split via wire the fraudulently obtained funds from Highmore amongst Defendants in contravention of the Payment Agent Agreement, Escrow Agreements and invoices.

185.   When each of the three steps was completed, Defendants—having just successfully embezzled and laundered funds from Highmore—in turn, engaged in a pattern whereby they repeated the three steps to defraud Highmore of even more funds.  Defendants ceased submitting fraudulent invoices after May 30, 2020, when Defendant TGC defaulted on the repayments due to Highmore for the prior transactions carried out by the enterprise.  Defendants TGC and Greig then made repeated attempts to explain and purportedly resolve TGC and Greig's defaults by again providing false, misappropriated, and/or inaccurate financial documents and information about TGC and Datassure's financial status to Highmore via email and telephone, including, upon information and belief, from fictitious representatives of TGC.

170421133

186.    The enterprise and its fraudulent scheme were sophisticated.  On information and belief, TGC and Greig filed the fraudulent financial document, Form D, with the SEC in August 2015.  On information and belief, the enterprise members planned the fraudulent scheme for at least four years since the Form D was filed, and the fraud that Highmore fell victim to was years in the making.  Even after the January 17, 2020 and January 31, 2020 transactions, the fraudulent activities of the enterprise continued as TGC, Greig and others provided false information and fraudulent communications and emails to Highmore in an effort to misdirect, deceive and thwart Highmore to i) cover up the fraud that had occurred, ii) give Highmore false assurances about repayment, and iii) preserve the possibility of entering into more fraudulent transactions with Highmore.  Upon information and belief, had Highmore not stopped funding TGC following TGC's default on the January 2020 transactions, the enterprise's scheme would have continued.

187.    The enterprise also likely involves other members, including entities and individuals who assisted in producing falsified financial statements and fraudulent tax returns, laundering and embezzling the funds that were fraudulently obtained from Highmore, and communicating false assurances about TGC's ability and willingness to repay Highmore.

### A.    Step 1: Fraudulently Obtain and Maintain Financing

188.    Defendants TGC, Greig, Datassure and Sparrow each engaged in a scheme to obtain a line of credit and increases to that line of credit from Highmore through the use of fraudulent, misappropriated, and/or inaccurate financial documents and information.  They used email and telephone calls to transmit the falsified business records and misinformation to Highmore.

189.    Beginning in or about July 2019, Defendants TGC, Greig, Datassure and Sparrow sought to obtain a line of credit from Highmore for the alleged purpose of acquiring computer technology equipment for Datassure.  It is now apparent, however, that Defendants actually

52

conspired and formed an association-in-fact enterprise with the intent to defraud and embezzle and launder funds from Highmore through a scheme utilizing fraudulent telephone calls, wires, emails, financial documents and invoices.

190.    Between in or about July 2019 and in or about September 2019, Defendants TGC, Greig, Datassure and Sparrow provided Zenith and Highmore with documents relating to their financial situations that were misappropriated, falsified and/or inflated.

191.    In discussions with Zenith and Highmore, Greig claimed to be a significant shareholder of The Greig Companies, a family business with deep European ties to the insurance, reinsurance and shipping industries.  Unbeknownst to Highmore at the time, and later discovered through investigation, and upon information and belief, Greig has no such ties to the European companies that contain "Greig" in their names.

192.    On or about July 2, 2019, Greig provided via email to Zenith a Dropbox folder containing diligence materials, including a business overview of TGC purporting to show $250 million in capitalization from Greig and other family trusts and reflecting Greig as a Board Director and Managing Director of TGC in North America.  Greig, Sparrow, Datassure and TGC knew that Zenith would share the diligence materials with Highmore to review as the lender.

193.    Greig also furnished Zenith, which then forwarded the documents to Highmore. with several years of corporate tax returns and bank statements reporting the current net assets of TGC as totaling in excess of approximately $330,000,000.

194.    Greig also provided Zenith, who forwarded the documents to Highmore, with Financial Statements and Independent Accountants' Compilation Reports for TGC purportedly certified by Deloitte, dated December 31, 2016, December 31, 2017, December 31, 2018 and

December 31, 2019, as well as an independent auditor report from GBH CPAs, PC, confirming approximately $250,000,000 in cash on deposit.

195.    Greig also provided a personal financial statement reflecting a net worth just shy of $300,000,000.

196.    Greig also participated in a final diligence phone call with Highmore and Jeffrey Sparrow, an officer at Datassure, in which he made additional representations about TGC's financial status.

197.    Pursuant to the agreements described above, Highmore evaluated TGC's request for financing utilizing the financial information supplied by TGC, which Highmore did not know at the time, but later learned through investigation and upon information and belief, contained inflated and false information. Highmore conveyed that it was prepared to issue financing to TGC based on the financial information available to Highmore at the time. Then, Euler Hermes, which according to its website is the "world's leading provider of trade-related insurance solutions," evaluated the same financial information supplied by TGC, also without knowing at the time that it contained inflated and false information, and issued a $5,000,000 insurance policy to FF Supply, Inc. in which Highmore is listed as the insured entity. While Highmore conducted its own extensive due diligence, the fact that Euler Hermes evaluated the same financial information and approved coverage provided Highmore with added comfort. As such, Highmore committed to issuing $5,000,000 in supplier credit financing to TGC. On September 24, 2019, Zenith entered into the Payment Agent Agreement with TGC, whereby Zenith agreed to act as payment agent for TGC with respect to computer equipment that Highmore would purchase from Storbyte on behalf of TGC to deliver to Datassure.

198.    Unbeknownst to Highmore at the time, and later discovered through investigation, and upon information and belief, the TGC business overview, TGC financial statements, Greig's personal tax documents, Greig's personal financial statements and Greig's representations on behalf of TGC and himself that were provided by Greig as part of the due diligence process contained inaccurate information and inflated financial figures for both TGC and Greig, and/or were misappropriated from companies unrelated to Greig, and/or were entirely falsified.

199.    Specifically, with respect to the Financial Statements and Independent Accounts' Compilation Reports for TGC purportedly certified by Deloitte, Deloitte confirmed that neither TGC nor Greig was ever a Deloitte client, which was unbeknownst to Highmore at the time Greig furnished the reports to it.  Indeed, in or about September 2021, Highmore learned that Deloitte repeatedly sent letters to TGC instructing the company to cease and desist from making false representations, and when TGC/Greig failed to respond, Deloitte reported the matter to the SEC.

200.    Additionally, Greig provided bank statements purportedly from the Bank of America.  Upon information and belief, unbeknownst to Zenith and Highmore at the time, and later discovered through investigation, these bank statements are fraudulent.

201.    TGC, Greig, Datassure and Sparrow engaged in the due diligence process, and TGC and Greig entered into the Payment Agent Agreement and Guaranty, despite knowing that i) Datassure and TGC did not meet the financial requirements to obtain funding from Highmore; ii) TGC was unable to and would not repay Highmore's loans pursuant to the Payment Agent Agreement; and iii) Greig was unable to and would not repay TGC and his obligations pursuant to the Guaranty.  Highmore was unaware of these facts at the time the Payment Agent Agreement was negotiated, executed and assigned.

202.    After each time that TGC requested funding, i) Highmore approved a transaction based on the invoices provided to Zenith/Highmore via email by TGC and Greig—which purported to reflect the price of equipment allegedly purchased from Storbyte and delivered to Datassure; ii) Highmore wired the requested funds to TGC and/or Equinox, as the escrow agent to TGC, Datassure and Storbyte; and iii) after Defendants distributed the fraudulently obtained funds in contravention of the Payment Agent Agreement and the invoices, Defendants TGC, Greig, Datassure and Sparrow again engaged in the financial scheme to obtain increases in the line of credit by either repaying the prior balance with funds obtained through a subsequent transaction—in true Ponzi scheme fashion—or by providing falsified, misappropriated and/or inflated financial information, documents and business records to Highmore via email and telephone in an effort to show that TGC was purportedly financially sound and allegedly capable of repaying a higher loan amount.

203.    Following the September 2019 and October 2019 financing transactions, Greig, on behalf of TGC, requested an increase in the supplier credit financing from $5,000,000 to $10,000,000 from Highmore.

204.    On October 28, 2019, after assessing TGC's creditworthiness and conducting due diligence, Euler Hermes approved an increase in the insured amount on the insurance policy from $5,000,000 to $10,000,000.  While Highmore conducted its own extensive due diligence, the fact that Euler Hermes evaluated the same financial information and approved additional coverage provided Highmore with added comfort.  As such, Highmore committed to increase the supplier credit financing issued to TGC from $5,000,000 to $10,000,000.

205.    To bolster the increase request, Datassure, for the benefit of its affiliate TGC, wired Highmore $3,000,000 on or about October 30, 2019, and $1,205,005 on or about November 1,

2019, as repayment in full for the loans issued by Highmore for the September 2019 and October 2019 transactions.

206.    In or about December 2019, TGC requested an increase in the supplier credit financing from $10,000,000 to $20,000,000 from Highmore.

207.    On or about December 20, 2019, Euler Hermes approved an increase in the insured amount on the insurance policy based on their internal credit assessment and due diligence.  While Highmore conducted its own extensive due diligence, the fact that Euler Hermes evaluated the same financial information and approved coverage provided Highmore with added comfort.  As such, Highmore committed to increase the supplier credit financing issued to TGC from $10,000,000 to $20,000,000.

208.    To bolster the increase request, Datassure, for the benefit of its affiliate TGC, wired Highmore $9,981,268.85 to repay the loan for the November 2019 transaction on January 23, 2020. Unbeknownst to Highmore at the time, and upon information and belief, TGC used the funds wired from Highmore in the January 17, 2020 transaction, and disbursed to Datassure on January 17, 2020, to repay, in part, the outstanding balance from the November 2019 transaction.

209.    After TGC defaulted and failed to repay the $12,819,490.80 owed to Highmore pursuant to the Payment Agent Agreement for the January 17, 2020 and January 31, 2020 transactions, which remains outstanding, the pattern of fraudulent activity involving wire and mail fraud continued.  Defendants TGC and Greig repeatedly provided Highmore with misinformation, falsified business records, falsified email communications and misappropriated financial information via telephone calls, emails and in-person meetings in an effort to misdirect, deceive and thwart Highmore in an effort to i) cover up the fraud that had occurred, ii) give Highmore false assurances about repayment, and iii) preserve the possibility of entering into more fraudulent

transactions with Highmore.  On information and belief, had Highmore not stopped funding TGC following TGC's default on the January 2020 transactions, the enterprise's scheme would have continued.

210.    On or about May 20, 2020, during a conference call with representatives of Highmore held to discuss TGC's default on the January 17, 2020 transaction balance, Greig represented to Highmore that TGC was in the process of obtaining an asset-based lending facility from Iron Horse that would buy Highmore out of the debt owed.  Greig stated that the deal was expected to close in the following week.  TGC never obtained an asset-based lending facility from Iron Horse.

211.    On or about August 27, 2020, Beggin and Reifler visited the Datassure offices in Irvine, California to discuss repayment options with Greig.  Greig represented to Highmore that he had three separate repayment paths in the works, including 1) a small line of credit for Datassure that would allow TGC or Greig to make a $500,000 good faith payment toward the balance owed; 2) a Transunion overage that would allow TGC or Greig to make a $5,000,000 good faith payment; and 3) a JP Morgan line of credit to TGC that was linked to the credit lines that TGC purportedly had in place with Lloyds Bank in the UK that would allow TGC to repay the entire amounts owed. None of the three paths ever resulted in a deal for TGC or a payment toward the balance owed to Highmore.

212.    On or about October 6, 2020, Lereau, purportedly a secretary at TGC, sent Highmore a letter in which TGC acknowledged the principal amounts and late fees owed for the January 17 and January 31 transactions as of September 30, 2020.  The letter states, "The Company is currently in the process of undertaking a line of credit, domestically in the US, with which it intends to pay this debt."  However, upon information and belief, no line of credit was obtained

for this purpose.  Upon information and belief, Lereau is a fictitious person invented by Greig in order to perpetuate the fraudulent scheme.

213.    Greig and Lereau made additional representations related to possible repayment paths involving lines of credit and interbank credit applications from, *inter alia*, JP Morgan Chase and Lloyds Bank on multiple occasions either in person or in correspondence on or about November 17, 2020; November 20, 2020; December 7, 2020; February 8, 2021; February 15, 2021; February 23, 2021; March 5, 2021; May 5, 2021; and May 20, 2021.

214.    In May 2021, Greig represented to Highmore that TGC was being purchased by Maersk, a member of the A.P. Moller Group.

215.    On May 5, 2021 and May 20, 2021, Lereau purportedly sent Jogia and Reifler screenshots via email purporting to be from Lloyds Bank's link portal reflecting a pending wire for $24,466,688.06 to the First Republic Bank swift code and reflecting the status of the credit line.  Unbeknownst to Highmore at the time and upon later discovery during an investigation, the screenshots were fabricated.

216.    On May 28, 2021, Lereau purportedly sent representatives of Highmore a letter on Greig's letterhead stating that the obligation of TGC is still true and owing.  The letter was signed by Julia Van Den Hoogen, whom Greig represented was a Maersk employee.  Upon information and belief, Hoogen is a fictitious person invented by Greig in order to perpetuate the fraudulent scheme.  The letter also listed an address of "Esplanaden 50 1263, København K, Hovedstaden Denmark," which corresponds to a Maersk company address.  Unbeknownst to Highmore at the time and upon later discovery during an investigation, the letter did not come from an employee of Maersk.

170421133

217.    On or about June 10, 2021, Greig represented to representatives of Highmore at an in-person meeting that he had 600,000 restricted Maersk B shares in his brokerage account, which corresponded to $1,700,000,000 in market cap; however, he was unable to sell such shares until year-end as a result of a purchase agreement between TGC and Maersk.  Unbeknownst to Highmore at the time and upon later discovery during an investigation, no such shares existed.

218.    On June 17, 2021, during a conference call with Jogia, Jiang, and Beggin, Greig represented that his wealth manager, Jacob Nelson, would provide verification of the Maersk shares.  Upon information and belief, Nelson is a fictitious person invented by Greig in order to perpetuate the fraudulent scheme.

219.    That same day, Greig purported to email Nelson with Highmore representatives copied on the email.  Greig requested that Nelson provide an audit confirm to Highmore.  The email domain purportedly belonging to Nelson was "@brittaniasecuritiesintl.com."  Unbeknownst to Highmore at the time and upon later discovery during an investigation, that email domain appears on a list of newly registered domains for the date of June 17, 2021, on https://www.thesiterank.com/newly-registered-domain-names-by-date/2021-06-17/3, and the domain is not associated with a website.

220.    On June 18, 2021, Nelson purportedly responded to Greig's June 17, 2021 email copying Highmore representatives by attaching a draft audit confirm awaiting Greig's signature. Greig then sent Highmore a signed audit confirm via email.  Per the instructions on the confirm, Jogia sent the audit confirm signed by Greig to "Audit.confirms@brittaniasecuritiesintl.com." That same day, Beggin also submitted a request for instructions on the audit confirm process for Britannia Securities International, Ltd. via the "Contact us" website link for Brittania Global Markets.

60

221. On June 21, 2021, a Highmore representative received an email from Dominic Bacon, the general counsel of Britannia Global Markets, stating that "Brittania Securities International, Ltd." was not affiliated with Brittania Global Markets. Highmore representatives then called Bacon to further discuss his email response, and Bacon explained that he was general counsel for Brittania Global Markets and the holding company Brittania Financial Group. Bacon explicitly stated that neither Nelson or Britannia Financial International, Ltd. was known to him or affiliated with the entities for which he worked. Bacon stated that either Highmore or a Highmore client might be subject to some kind of fraud.

222. That same day, Highmore received a countersigned audit confirm from "Audit.confirms@britanniasecuritiesintl.com" reflecting 600,000 Maersk B shares in the account, roughly equivalent to $1,700,000,000. Upon information and belief, Greig falsified the audit confirm, or caused the falsification of the audit confirm, in order to perpetuate the fraudulent scheme.

223. On June 22, 2021, Highmore representatives called Steve Schueler, the Chief Commercial Officer of A.P. Moller Maersk, for information on how A.P. Moller operates in acquisitions of other companies. They described the transaction Greig conveyed to them, and Schueler stated that he found the manner of the purchase of TGC to be suspicious because it involved the use of Maersk B shares as opposed to cash. Schueler described the previous purchases with which he was familiar as involving cash.

224. Each time Highmore agreed to issue supplier credit financing or increase the financing limit for TGC with the added comfort of Euler Hermes's policy approvals, Defendants moved onto the next step in the scheme to defraud Highmore until Highmore ceased approving transactions due to TGC and Greig's default.

**B.      Step 2: Induce Payment with False Invoices**

225.     In furtherance of the enterprise's common purpose and to conduct the enterprise's affairs, Defendants TGC, Greig, Sparrow, StorByte, Groenke, Lauffin and PayRange worked together to embezzle and launder funds from Highmore by issuing fraudulent and inflated invoices and sending them via email to Highmore to induce Highmore to wire funds to Defendants.

226.     From on or about September 12, 2019 to on or about November 4, 2019, the invoices submitted to Highmore by TGC, Greig, Sparrow, StorByte, Lauffin, Groenke and PayRange appeared legitimate, and the transactions were approved and funded by Highmore.  In turn, the transactions were repaid by TGC, but only in conjunction with TGC's requests for financing increases and Highmore's subsequent granting of said increases with the added comfort of Euler Hermes's policy approvals.

227.     In or about September 2019, TGC submitted a financing request to Highmore for the purchase of computer equipment from Storbyte that would be delivered to TGC's affiliate, Datassure, to facilitate installation and hosting for TGC's benefit.  In support of TGC's financing requests, TGC sent Highmore the September 11, 2019 TGC Purchase Order and the September 12, 2019 Storbyte Invoice, each listing and describing equipment sold to TGC that would be shipped to TGC and Datassure and reflecting total amounts due of $2,800,000 (excluding tax) and $3,017,000 (including tax), respectively.  The two invoices mirrored each other with respect to the prices, type and quantity of the equipment being purchased from Storbyte.

228.     On or about September 26, 2019, Highmore issued the September 26, 2019 Zenith Invoice to TGC for the equipment referenced in the September 12, 2019 Storbyte Invoice and a wire fee, listing the balance due from TGC as $3,077,360 and the due date as October 26, 2019. The September 26, 2019 Zenith Invoice also included the agreed-upon late fee charge of two

percent per month if the invoice was not paid within three days of the invoice date pursuant to Section 3.4 of the Payment Agent Agreement.

229.    Highmore reviewed and relied upon the September 12, 2019 Storbyte Invoice and September 11, 2019 TGC Purchase Order in determining whether to approve TGC's financing request.  On September 30, 2019, Highmore approved the request, and on September 30, 2019, Highmore wired $3,017,000 to Equinox in accordance with the September 20, 2019 Escrow Agreement for TGC to use in its entirety as payment to Storbyte for the purchased equipment. Unbeknownst to Highmore at the time and upon later discovery, on information and belief, the prices and amount of equipment listed in the invoices for this transaction were inaccurate and/or inflated.

230.    On or about October 1, 2019, TGC submitted another financing request to Highmore via email for the purchase of computer equipment from Storbyte that would be delivered to TGC's affiliate, Datassure, to facilitate installation and hosting for TGC's benefit.  In support of TGC's financing request, TGC emailed Highmore the October 1, 2019 Storbyte Invoice, listing and describing equipment sold to TGC that would be shipped to Datassure and reflecting a total amount due of $1,105,515, including tax.  TGC also emailed Highmore the October 1, 2019 TGC Purchase Order, listing the hardware storage equipment being purchased from Storbyte and reflecting a total amount due for the purchase of $1,026,000, excluding tax.  The October 1, 2019 TGC Purchase Order was signed by Greig.

231.    On October 2, 2019, Highmore issued the October 2, 2019 Zenith Invoice to TGC for the equipment referenced in the October 1, 2019 Storbyte Invoice and a wire fee, noting that the invoice was subject to the Payment Agent Agreement and listing the balance due from TGC as $1,127,645.30 with a due date of October 26, 2019.  The October 2, 2019 Zenith Invoice also

included the agreed-upon late fee charge of two percent per month if the invoice was not paid within three days of the invoice date pursuant to Section 3.4 of the Payment Agent Agreement.

232.     Highmore reviewed and relied upon the October 1, 2019 Storbyte Invoice and October 1, 2019 TGC Purchase Order in determining whether to approve TGC's financing request, and approved the request on October 4, 2019.  On October 4, 2019, Highmore wired the funds to TGC via its escrow agent, Equinox, for use in its entirety to pay Storbyte for the equipment purchased.  Unbeknownst to Highmore at the time and upon later discovery, on information and belief, the prices and amount of equipment listed in the invoices for this transaction were inaccurate and/or inflated.

233.     While awaiting decision on a request for an increase in the supplier credit financing from $5,000,000 to $10,000,000, Datassure, for the benefit of its affiliate TGC, wired Highmore $3,000,000 on October 30, 2019, and $1,205,005 on November 1, 2019 as repayment in full for the loans issued by Highmore for the September 30, 2019 transaction and the October 4, 2019 transaction.  It now appears that TGC made this payment to build good will with Highmore so that the enterprise could continue to obtain fraudulent financing approvals and funding for false transactions and perpetuate its scheme to defraud Highmore.

234.     On or about November 4, 2019, TGC submitted another financing request via email to Highmore for the purchase of computer equipment from Storbyte that would be delivered to TGC's affiliate, Datassure, to facilitate installation and hosting for TGC's benefit.  In support of TGC's financing request, TGC sent Highmore the November 4, 2019 Storbyte Invoices, which consisted of four invoices purportedly from Storbyte, numbered DL2191104-1, DL2191104-2, DL2191104-3 and DL2191104-4.  The invoices listed and described equipment sold to TGC that

would be shipped to Datassure and reflected total amounts due for the equipment of $2,109,745, $2,211,030, $2,202,410 and $2,893,087.50, respectively, including tax.

235.   TGC also sent Highmore the November 4, 2019 TGC Purchase Orders.  The total amounts due for the purchases were $1,958,000, $2,052,000, $2,044,000 and $2,685,000, respectively, which excluded the tax amount listed on the November 4, 2019 Storbyte Invoices. The November 4, 2019 TGC Purchase Orders were signed by Greig.

236.   On November 4, 2019, Highmore issued the four November 4, 2019 Zenith Invoices.  The balances due from TGC were $2,236,349.70, $2,343,691.80, $2,334,554.60 and $3,066,672.75, respectively, and the due dates were February 2, 2020.  The November 4, 2019 Zenith Invoices also included the agreed-upon late fee charge of two percent per month if the invoice was not paid within three days of the invoice date pursuant to Section 3.4 of the Payment Agent Agreement.

237.   Highmore reviewed and relied upon the November 4, 2019 Storbyte Invoices and November 4, 2019 TGC Purchase Orders in determining whether to approve TGC's financing request.  On November 4, 2019, Highmore approved the request, and that same day, Highmore wired $9,416,272.50 to TGC via Equinox for TGC to use in its entirety as payment to Storbyte for the purchased equipment for Datassure.

238.   However, unbeknownst to Highmore at the time and later discovered through investigation and upon information and belief, the November 4, 2019 Storbyte Invoice numbered DL2191104-4 was fraudulent.  It listed the purchase of PayRange equipment that Storbyte did not carry or sell.  That invoice also listed that PayRange equipment at prices that were significantly inflated.  The November 4, 2019 TGC Purchase Order that corresponded to that same Storbyte

Invoice also reflected PayRange equipment that Storbyte did not carry or sell and the inflated price for that nonexistent equipment.  It was also fraudulent.

239.    On or about January 13, 2020, TGC submitted another financing request to Highmore for the purchase of computer equipment from Storbyte that would be delivered to TGC's affiliate, Datassure, to facilitate installation and hosting for TGC's benefit.  In support of TGC's financing request, TGC emailed Highmore the January 13, 2020 Storbyte Invoices, which were numbered DL2200113-1 and DL2200113-2 and each listed and described equipment sold to TGC that would be shipped to Datassure.  The invoices listed total amounts due of $5,204,325 and $452,550, respectively, including tax.  TGC also emailed Highmore the January 13, 2020 Purchase Orders, listing the same hardware storage equipment purportedly being purchased from Storbyte. The total amounts due for the purchases were listed as $4,830,000 and $420,000, respectively, excluding tax.  The January 13, 2020 TGC Purchase Orders were signed by Greig.

240.    On January 13, 2020, Highmore issued the January 13, 2020 Zenith Invoices to TGC for the equipment referenced in the January 13, 2020 Storbyte Invoices and a wire fee, noting that the invoices were subject to the Payment Agent Agreement.  The balances due from TGC were $5,620,691 and $488,774, respectively, and the due dates were May 12, 2020.  The January 13, 2020 Zenith Invoices also included the agreed-upon late fee charge of two percent per month if the invoice was not paid within three days of the invoice date pursuant to Section 3.4 of the Payment Agent Agreement.

241.    Highmore reviewed and relied upon the January 13, 2020 Storbyte Invoices and January 13, 2020 TGC Purchase Orders in determining whether to approve TGC's financing request.  On or about January 13, 2020, Highmore approved the request, and on  or about January 17, 2020, Highmore wired $5,656,875 to TGC via Equinox for TGC to use in its entirety as

payment to Storbyte for the purchased equipment for Datassure. However, unbeknownst to Highmore at the time and later discovered through investigation and upon information and belief, the January 13, 2020 Storbyte Invoices were fraudulent. They listed PayRange equipment at prices that were significantly inflated. The January 13, 2020 TGC Purchase Orders that corresponded to those same invoices also reflected the PayRange equipment at the inflated price. They were also fraudulent.

242.     On June 29, 2021, representatives of Highmore showed Groenke the January 13, 2020 Storbyte Invoice numbered DL2200113-1, which listed equipment purportedly purchased by TGC for $5,204,325. Groenke reviewed the invoice and stated that the amounts on the invoice did not make sense because while the equipment listed was manufactured by Storbyte, the listed prices were too high. Groenke confirmed that the invoice was a Storbyte invoice and that Lauffin was involved with the invoice due to the fact that the initials "DL" were in the invoice number.

243.     On or about January 29, 2020, TGC submitted another financing request to Highmore for the purchase of computer equipment from Storbyte that would be delivered to TGC's affiliate, Datassure, to facilitate installation and hosting for TGC's benefit. In support of TGC's financing request, TGC emailed Highmore the January 29, 2020 Storbyte Invoices, which were numbered DL2200129-1 and DL2200129-2 and listed and described equipment purportedly being sold to TGC that would be shipped to Datassure. The total amounts due for the equipment were listed as $6,986,126 and $5,833,364.80, respectively, including tax. TGC also emailed Highmore the January 29, 2020 TGC Purchase Orders, which corresponded to the invoices and listed the total amounts due for the purchases as $6,986,126 and $5,833,364, respectively. The January 29, 2020 TGC Purchase Orders were signed by Greig.

244.    On or about January 31, 2020, Highmore issued the January 31, 2020 Zenith Invoices to TGC for the equipment referenced in the January 29, 2020 Storbyte Invoices and a wire fee, noting that the invoices were subject to the Payment Agent Agreement.  The balances due from TGC were listed as  $7,545,036.08 and $6,300,033.98, respectively, and the due dates were May 30, 2020.  The January 31, 2020 Zenith Invoices also included the agreed-upon late fee charge of two percent per month if the invoice was not paid within three days of the invoice date pursuant to Section 3.4 of the Payment Agent Agreement.

245.    Highmore reviewed and relied upon the January 29, 2020 Storbyte Invoices and January 29, 2020 TGC Purchase Orders in determining whether to approve TGC's financing request.  On January 31, 2020, Highmore approved the request, and on January 31, 2020, Highmore wired $12,819,490.80 to TGC via Equinox for TGC to use in its entirety as payment to Storbyte for the purchased equipment.  However, unbeknownst to Highmore at the time and later discovered through investigation and upon information and belief, the January 29, 2020 Storbyte Invoices were fraudulent.  They listed the purported purchase of PayRange equipment that Storbyte did not carry or sell.  The invoices also listed that PayRange equipment at prices that were significantly inflated.  The January 29, 2020 TGC Purchase Orders that corresponded to those same invoices also reflected PayRange equipment that Storbyte did not carry or sell and the inflated price for that nonexistent equipment.  They were also fraudulent.

246.    On June 29, 2021, representatives of Highmore showed Groenke, the chief executive officer of Storbyte, the January 29, 2020 Storbyte Invoice, numbered DL2200129-1, which listed PayRange equipment purportedly purchased by TGC for $6,986,126.  Groenke reviewed the invoice and stated that Storbyte did not manufacture PayRange devices, meaning the invoice was inaccurate and falsified.  Groenke confirmed that the invoice was a Storbyte invoice

68

and that Lauffin was involved with the invoice due to the fact that the initials "DL" were in the invoice number.

247.     Each time TGC, Sparrow and Greig submitted a transaction request, Defendants knew the invoices were fraudulent and that TGC and Greig did not have the financial wherewithal to perform repayment under the Payment Agent Agreement.  However, once Highmore funded each transaction and wired the fraudulently requested amounts to Equinox, Defendants moved onto the next step in the scheme to defraud Highmore—disbursing the funds amongst Defendants as compensation for participation in the enterprise.

### C.     Step 3: Disburse Embezzled and Laundered Funds

248.     In furtherance of the enterprise's common purpose and to conduct the enterprise's affairs, Defendants TGC, Greig, Datassure, Sparrow, StorByte, Lauffin, Equinox, Harju and PayRange further worked together to embezzle and launder funds from Highmore by disbursing the fraudulently obtained funds among Defendants by wire instead of using the funds to repay Storbyte for actual equipment purportedly purchased by TGC and delivered to Datassure as the Payment Agent Agreement and invoices required.

249.     With respect to the September 30, 2019 transaction, TGC, Storbyte and Datassure retained Equinox to serve as an escrow agent to receive and distribute the funds in connection with the transactions contemplated by the Payment Agent Agreement.  On September 20, 2019, TGC, Storbyte and Datassure entered into the September 20, 2019 Escrow Agreement, in which Zenith was listed as the "Lender," to facilitate TGC's alleged purchase of certain goods from Storbyte and Highmore's financing of the same.  The September 20, 2019 Escrow Agreement was executed by Lauffin on behalf of Storbyte, Greig on behalf of TGC, and Sparrow on behalf of Datassure.  It was not executed on behalf of Equinox, although Harju emailed the agreement to Zenith and Highmore subsequently requested a copy including a signature on behalf of Equinox.  It provided:

In connection with Purchase Order No. 12537 dated September 11, 2019, issued by TGC to Storbyte in the amount of $2,800,000.00 plus applicable sales tax of $217,000, for a total of $3,017,000.00 . . . StorByte, TGC and Datassure have agreed, and hereby direct, that TGC's funds in the amount of $3,000,000.00 be paid to Escrow Agent in a non-interest bearing account. . . . The Parties further agree that an additional amount of $5,000,000.00 . . . be paid to Escrow Agent in a non-interest bearing account on or about October 20, 2019 in connection with additional purchase orders issued to StorByte. . . . No funds shall be disbursed without the written permission of all Parties to this Agreement or their attorneys. In the event of any disagreement hereunder, or in the absence of any written instructions, Escrow Agent may retain the Escrowed Funds pending written instructions mutually given or, in the sole discretion of Escrow Agent.

250. Highmore wired $3,017,000 to Equinox in accordance with the September 20, 2019 Escrow Agreement, executed by TGC, Greig, Datassure, Sparrow, Storbyte and Lauffin, for TGC to use in its entirety as payment to Storbyte for the purchased equipment for Datassure. However, unbeknownst to Highmore at the time and later discovered through investigation, the funds intended to repay Storbyte for purported equipment allegedly purchased for delivery to Datassure were misappropriated and laundered in contravention of the Payment Agent Agreement and invoices. On September 20, 2019, Storbyte, Datassure and TGC instructed Equinox in a letter with the subject line "Escrow Disbursement Instructions, Escrow Agreement dated September 20, 2019" to disburse the incoming $3,000,000 wire as follows on September 23, 2019: 1) $64,448.37 to Equinox for "Billings" and "Retainer"; 2) $980,711.60 to Storbyte for "Sales Tax" and "Hardware"; 3) $1,954,790.03 to Datassure with no explanation; and 4) $50 for "Bank Fees." Greig executed the letter on behalf of TGC, Lauffin executed the letter on behalf of Storbyte and, upon information and belief, Sparrow executed the letter on behalf of Datassure.[47] Harju, who personally transmitted the September 20, 2019 Escrow Agreement, was aware that the escrow release instructions did not conform to the invoices referenced therein.

---

[47] *See* Exhibit H.

251.    With respect to the October 4, 2019 transaction, upon information and belief, in or about October 2019, TGC, Storbyte and Datassure entered into the October 2019 Escrow Agreement, to facilitate TGC's alleged purchase of certain goods from Storbyte and Highmore's financing of the same.

252.    On October 4, 2019, Highmore wired $1,105,515 to Equinox in accordance with the October 2019 Escrow Agreement for TGC to use in its entirety as payment to Storbyte for the purchased equipment.  However, unbeknownst to Highmore at the time and later discovered through investigation, the funds intended to repay Storbyte for purported equipment allegedly purchased for delivery to Datassure for TGC's benefit were again misappropriated and laundered in contravention of the Payment Agent Agreement and invoices.

253.    With respect to the November 4, 2019 transaction, on information and belief, on or about November 2019, TGC, Storbyte and Datassure entered into the November 2019 Escrow Agreement to facilitate TGC's alleged purchase of certain goods from Storbyte and Highmore's financing of the same.

254.    On November 4, 2019, Highmore wired $9,416,272.50 to Equinox in accordance with the November  2019 Escrow Agreement for TGC to use in its entirety as payment to Storbyte for the purchased equipment for Datassure.  However, upon information and belief, unbeknownst to Highmore at the time and later discovered through investigation, the funds intended to repay Storbyte for purported equipment allegedly purchased for delivery to Datassure for TGC's benefit were again misappropriated and laundered in contravention to the Payment Agent Agreement and invoices.

255.    With respect to the January 17, 2020 transaction, that same day, TGC Storbyte, and Datassure entered into the January 17, 2020 Escrow Agreement in order to facilitate TGC's

170421133

alleged purchase of equipment from Storbyte and Highmore's financing of the same.  The January

17, 2020 Escrow Agreement was executed by Lauffin on behalf of Storbyte, Greig on behalf of

TGC, Sparrow on behalf of Datassure, and Harju on behalf of Equinox.  It provided:

> In connection with StorByte's Invoice Nos. 2200113–1 and 2200113–2, dated January 13, 2020, issued by StorByte to TGC in the amount of $5,656,875.00 . . . StorByte, GC and Datassure have agreed, and hereby direct, that TGC's funds in the amount of: $5,656,875.00 . . . be paid to Escrow Agent in a non-interest bearing account.  The Parties further agree that any additional amounts from Lender be paid to Escrow Agent in a non-interest bearing account in connection with subsequent invoices issued to StorByte. . . .  No funds shall be disbursed without the written permission of all Parties to this Agreement or their attorneys.  In the event of any disagreement hereunder, or in the absence of any written instructions, Escrow Agent may retain the Escrowed Funds pending written instructions mutually given or, in the sole discretion of Escrow Agent.

256.    The January 17, 2020 Escrow Agreement identified Zenith as the Lender and

Equinox as the Escrow Agent.  On January 17, 2020, Highmore wired $5,656,875 to Equinox in

accordance with the January 17, 2020 Escrow Agreement for TGC to use in its entirety as payment

to Storbyte for the purchased equipment.  However, unbeknownst to Highmore at the time and

later discovered through investigation, the funds intended to repay Storbyte for purported

equipment allegedly purchased for delivery to Datassure for TGC's benefit were again

misappropriated and laundered in contravention to the Payment Agent Agreement and invoices.

On January 17, 2020, Storbyte, Datassure and TGC instructed Equinox in a letter to disburse the

incoming $5,656,875 wire as follows on January 20, 2020: 1) $50,000 to Equinox as a "Retainer";

2) $5,606,830 to Datassure without explanation; and 3) $45 in "Bank Fees."[48]  Once again, Harju

was aware that the escrow release instructions did not conform to the invoices referenced in the

January 17, 2020 Escrow Agreement.

---

[48] *See* Exhibit AG.

170421133

257.    With respect to the January 30, 2020 transaction, TGC, Storbyte and Datassure entered into the January 30, 2020 Escrow Agreement to facilitate the transfer of funds in connection with the invoices.  The January 30, 2020 Escrow Agreement was executed by Lauffin on behalf of Storbyte, Greig on behalf of TGC, Sparrow on behalf of Datassure, and Harju on behalf of Equinox.  It provided:

> In connection with StorByte's Invoice Nos. 2200129-1 and 2200129-2, dated January 29, 2020, issued by StorByte to TGC in the total amount of $12,819,490.80 . . . StorByte, TGC and Datassure have agreed, and hereby direct, that TGC's funds in the amount of $12,819,490.80 . . . be paid to Escrow Agent in a non-interest bearing account.  The Parties further agree that any additional amounts from Lender be paid to Escrow Agent in a non-interest bearing account in connection with subsequent invoices issued to StorByte.  . . .   No funds shall be disbursed without the written permission of all Parties to this Agreement or their attorneys.   In the event of any disagreement hereunder, or in the absence of any written instructions, Escrow Agent may retain the Escrowed Funds pending written instructions mutually given or, in the sole discretion of Escrow Agent.

258.    The January 30, 2020 Escrow Agreement once again identified Zenith as the Lender and Equinox as the Escrow Agent.

259.    On January 31, 2020, Highmore wired $12,819,490.80 to Equinox in accordance with the January 30, 2020 Escrow Agreement for TGC to use in its entirety as payment to Storbyte for the purchased equipment for Datassure.  However, unbeknownst to Highmore at the time and later discovered through investigation, the funds intended to repay Storbyte for purported equipment allegedly purchased for delivery to Datassure were again misappropriated and laundered in contravention to the Payment Agent Agreement and invoices.  On January 30, 2020, Storbyte, Datassure and TGC instructed Equinox in a letter to disburse the incoming $12,819,490.80 wire as follows on February 3, 2020: 1) $1,000,000 to Equinox/TGC without explanation; 2) $1,476,249.06 to Storbyte without explanation; 3) $10,343,166.74 to Datassure

without explanation; and 4) $75 in "Bank Fees."[49]  Once again, Harju was aware that the escrow release instructions did not conform to the invoices referenced in the January 31, 2020 Escrow Agreement.

260.    After each transaction was funded and the funds were disbursed, Defendants repeated the three-step cyclical scheme until on or about May 30, 2020, when TGC defaulted on repayment due for the January 17, 2020 and January 30, 2020 transactions.

261.    On or about June 24, 2021, Greig and representatives of Highmore met at the TGC and Datassure offices in Irvine, California.  At the meeting, Highmore requested the return of all assets purchased by TGC with the financing funds that were not repaid because, pursuant to the Payment Agent Agreement, Highmore retained title to the assets.   Specifically, Highmore requested the return of i) the PayRange devices, and ii) the Storbyte servers.  Greig responded that he did not know the location of the PayRange devices because of a contractual dispute with PayRange, and Greig shared copies of the contracts between Datassure and PayRange with Highmore.  Greig also responded that two boxes of assets purchased from Storbyte were located in Irvine and two others were located in Nevada.  The Highmore personnel left with the Irvine boxes that day.  Greig also disclosed that six server boxes were still in the possession of Storbyte Inc. in Washington, DC, and that only two of those were owned by Highmore.  All of these server boxes belong to Highmore, as they were purchased with Highmore capital and ownership was retained until repayment per the Payment Agent Agreement.

262.    On June 29, 2021, representatives of Highmore met with Storbyte CEO Groenke in New York.  Groenke stated that while certain monies were paid to Storbyte by TGC, the payments were incomplete and Storbyte had not received payment for all of the equipment purportedly

---

[49] *See* Exhibit AM.

170421133

purchased by TGC for Datassure.  As a result, Groenke stated that Storbyte was still owed $480,000 by TGC and that Storbyte retained the six boxes in Storbyte's possession.  Groenke also stated that Lauffin, who had signed all of the aforementioned escrow agreements on behalf of Storbyte, was never an employee of Storbyte and was actually a reseller.

263.    On or about late June 2021, Highmore learned through an internet search that Harju, the attorney from Equinox representing TGC, Datassure and Storbyte and serving as escrow agent, also served as the General Counsel for Datassure at some point in time.

264.    Since fraudulently redirecting the funds resulting from the January 17, 2020 and January 31, 2020 transactions and defaulting on repayment as well as improperly disbursing Highmore's other wires among the members of the enterprise, Greig, TGC, Datassure, Sparrow and other executives of Datassure have, upon information and belief, spent hundreds of thousands of dollars on luxury vehicles, including an Aston Martin, a Mercedes-Benz G Wagon, a second Mercedes sedan, and a Tesla Model X.

265.    On information and belief, on December 31, 2019, Paul King, the Chief Strategy Officer of Datassure, recorded a deed for property purchased at 2045 Campo Verde, Escondido, CA 92026 under the name of a different corporation he co-manages.  Sparrow currently resides at that address.

266.    Upon information and belief, soon after the January 17, 2020 and January 31, 2020 transactions, Greig moved into an exclusive community in Newport Coast with the address of 24 Morning Light, Newport Coast, CA 92657 and rent of approximately $19,000 per month.  Also, upon information and belief, Greig moved into an even more exclusive community in Laguna Beach in early 2021 with an address of 40 Smithcliffs Road and rent of approximately $21,500 per month.

170421133

267.     In addition, TGC and Datassure rent office space at 2 Park Plaza, Irvine, CA 92614 for approximately $50,000 per month.  Upon information and belief, they are at least two months in arrears on this office space and the landlord, The Irvine Companies, is seeking eviction.

268.     Does 1-4 assisted Defendants in producing and transmitting falsified financial documents and fraudulent invoices, communicating misinformation to Zenith and Highmore, and/or distributing, collecting and spending the misappropriated funds obtained as a result of the enterprise's fraudulent scheme

269.     Defendants' i) misrepresentations via telephone and in person; ii) provision of fraudulent business records, misappropriated financial information, falsified emails and letters, and inflated and falsified invoices via email; iii) disbursement of fraudulently obtained wired funds from Highmore amongst Defendants via wire; and iv) repetition of each of those steps all furthered the common purpose and fraudulent scheme of the enterprise and constitute a pattern of racketeering activities, including through repeated instances of wire and mail fraud.

### D.     Injury Caused and Relief Sought

270.     For efficiency and to avoid repetition, for purposes of this claim, Highmore incorporates by reference the paragraphs of this Complaint.

271.     The violations of law and Defendants' pattern of racketeering activity directly and indirectly caused Highmore's injury.

272.     Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Highmore injury in its business and property because Highmore funded without repayment the default amounts described above in the allegations incorporated herein by reference.

273.     Defendants' pattern of racketeering activity, including their repeated i) misrepresentations via telephone and in person, including through the use of aliases; ii) provision

170421133

of fraudulent business records, misappropriated financial information, falsified emails and letters, and inflated and falsified invoices via email; and iii) disbursement of fraudulently obtained wired funds from Highmore amongst Defendants via wire, logically, substantially and foreseeably caused Highmore to incur millions in damages. Indeed, as a result of the conduct of each member of the enterprise and the enterprise's fraudulent scheme, Highmore suffered millions of dollars in damages.

274. As Highmore alleges, Defendants knew that TGC and Greig were not financially capable of obtaining financing from Highmore absent fraud and entered into agreements related to financing anyway. Defendants further knew that the invoices submitted to obtain funding for the transactions were falsified and listed equipment that did not exist or had inflated prices and submitted them to Highmore anyway. Defendants further knew that the funds wired from Highmore were transmitted solely for the purpose of paying Storbyte for equipment allegedly purchased for Datassure by TGC, but Defendants disbursed the funds amongst themselves anyway. Defendants engaged in a scheme of deception, which utilized the mail and wires as part of their fraud, in order to embezzle and launder funds from Highmore for Defendants' benefits.

275. The link of causation generally breaks down into four very short steps: i) Defendants provide Highmore with fraudulent information and documents; ii) Highmore relies on those documents and funds the transactions; iii) Defendants keep the funds obtained from Highmore and do not make repayment; and iv) Highmore is injured. This causal chain is a direct sequence and a logical, substantial and foreseeable cause of Highmore's injury. But for Defendants' embezzlement and laundering of money from Highmore by fraudulently obtaining the funds and failing to submit repayment, Highmore would not have lost money or property.

170421133

276.     Highmore's injuries include the $27,936,265.10 in principal, interest and fees that Highmore is presently owed for repayment of the January 2020 transactions on which TGC and Greig defaulted and an amount to be determined at trial for time, effort and wages spent on pursuing recovery of the default amounts.

277.     Highmore is most directly harmed and there is no other plaintiff better suited to seek remedy for the economic harms at issue here.

278.     Highmore seeks all legal and equitable relief as allowed by law, including, *inter alia*, actual damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorneys' fees and all costs and expenses of suit and pre- and post-judgment interest.

### COUNT II
### BREACH OF CONTRACT
### (Against TGC)

279.     Highmore incorporates by reference the allegations in the preceding paragraphs of the Complaint as if they were fully restated.

280.     Zenith and TGC entered into the Payment Agent Agreement on September 24, 2019.  Pursuant to the Payment Agent Agreement, Zenith agreed to act as a payment agent for TGC with respect to computer equipment that Zenith would purchase from Storbyte on behalf of TGC to deliver to Datassure.

281.     On September 30, 2019, Highmore and Zenith entered into the Assignment and Transfer Agreement whereby Zenith irrevocably assigned its undivided interest in the Payment Agent Agreement to Highmore.

282.     Pursuant to the Payment Agent Agreement, Highmore advanced funds on behalf of TGC on multiple occasions, including $5,656,875.00 on January 17, 2020 and $12,819,490.80 on

January 30, 2020.  Such payments were wired from Highmore to Equinox pursuant to the January 17, 2020 Escrow Agreement and the January 30, 2020 Escrow Agreement, respectively.

283.    Pursuant to the Payment Agent Agreement, TGC was required to repay Highmore the full amount of the January 17, 2020 transaction on or before May 12, 2020.  To date, Highmore has failed to remit the $5,656,875.00 to Highmore.  Similarly, TGC was required to repay Highmore for the full amount of the January 21, 2020 transaction on or before May 30, 2020.  Once again, Highmore failed to do so and the $12,819,490.80 paid by Highmore to Equinox on behalf of TGC remains outstanding.

284.    Despite the clear and unambiguous language of the Payment Agent Agreement, TGC has failed to remit the past-due amounts, including related late fees accrued as of each 30-day period the balance has remained unpaid, to Highmore.  In contrast, Highmore has performed all of its duties under the Payment Agent Agreement.

285.    As a result of the above, Highmore suffered millions of dollars in damages.

286.    Accordingly, TGC breached the Payment Agent Agreement and is liable to Highmore for the resulting damages in the amount of $27,936,265.10, including late fees accrued as of each 30-day period the balance has remained unpaid and that are continuing to accrue.

### COUNTS III-IX
### FRAUD IN THE INDUCEMENT
### (Against TGC and Greig)

287.    Highmore incorporates by reference the allegations in the preceding paragraphs of the Complaint as if they were fully restated.

288.    At the time of entering into the Payment Agent Agreement and the Guaranty with Zenith, TGC and Greig knowingly made false representations to Zenith regarding TGC's financial performance and ability to repay any loan obtained under the Payment Agent Agreement.

Specifically, Greig, both in his personal capacity and on behalf of TGC, provided Zenith with fraudulent financial statements and tax returns for TGC and his own fraudulent personal tax returns.

289.    Zenith reasonably relied upon such material information in making critical determinations regarding TGC's ability to repay Zenith under the Payment Agent Agreement, and Greig's ability to make such repayments under the Guaranty in the event of TGC's default.

290.    Pursuant to the Assignment and Transfer Agreement between Zenith and Highmore, Zenith assigned to Highmore its "right, title, and interest in" the Payment Agent Agreement along with its "rights, remedies, powers and privileges" under the same.

291.    TGC and Greig continued to make false representations each and every time they requested funding from Highmore and purported to maintain the financial ability to repay such requests.   Accordingly, TGC and Greig fraudulently induced Highmore with respect to the following:

> **COUNT III**: Fraudulent Inducement with respect to the Payment Agent Agreement;
>
> **COUNT IV**: Fraudulent Inducement with respect to the Guarantee;
>
> **COUNT V**: Fraudulent Inducement with respect to the September 30, 2019 Financing transaction;
>
> **COUNT VI**: Fraudulent Inducement with respect to the October 4, 2019 Financing transaction;
>
> **COUNT VII**: Fraudulent Inducement with respect to the November 4, 2019 Financing transaction;
>
> **COUNT VIII**: Fraudulent Inducement with respect to the January 17, 2020 Financing transaction; and
>
> **COUNT IX**: Fraudulent Inducement with respect to the January 31, 2020 Financing transaction.

292.     As a result of TGC's and Greig's false representations, Highmore was damaged in the amount of $27,936,265.10, including late fees accrued as of each 30-day period the balance has remained unpaid and that are continuing to accrue.

293.     The injuries alleged by Highmore herein were sustained as a direct and proximate cause of the Defendants' fraudulent conduct.

### COUNT X
### UNJUST ENRICHMENT
### (Against All Defendants)

294.     Highmore incorporates by reference the allegations in the preceding paragraphs of the Complaint as if they were fully restated.

295.     As set forth above, on January 17, 2020 Highmore caused funds in the amount of $5,656,875.00 to be paid to Equinox on behalf of TGC to fund TGC's purported purchase of Storbyte equipment.  Similarly, on January 31, 2020, Highmore caused funds in the amount of $12,819,490.80 to be paid to Equinox on behalf of TGC to once again fund TGC's purported purchase of Storbyte equipment.

296.     Pursuant to the terms of the Payment Agent Agreement, Highmore funded the January 17, 2020 transaction and the January 31, 2020 transaction based upon invoices submitted to Zenith by TGC for equipment purportedly purchased from Storbyte.  For both transactions, the money was wired to Equinox to be held in escrow.  However, instead of disbursing the funds held in escrow directly to Storbyte, Equinox disbursed such funds to Storbyte, TGC, Datassure and Greig and to itself.  Specifically, with respect to the January 17, 2020 transaction, Equinox distributed 1) $50,000 to itself; and 2) $5,606,830 to Datassure.  With respect to the January 31, 2020 transaction, Equinox distributed 1) $1,000,000 to TGC; 2) $1,476,249.06 to Storbyte; and 3) $10,343,166.74 to Datassure.

81

297.     As a result, Defendants were unjustly enriched by at least $19,954,515.07 at the expense of Highmore.

### COUNT XI
### CONVERSION
### (Against TGC, Greig and Datassure)

298.     Highmore incorporates by reference the allegations in the preceding paragraphs of the Complaint as if they were fully restated.

299.     As set forth above, Highmore maintained legal ownership over the Storbyte equipment that was delivered to Datassure on behalf of and for the benefit of TGC until TGC paid for such equipment.

300.     TGC, Greig and Datassure exercised unauthorized domain over the Storbyte equipment to the exclusion and derogation of Highmore's right of possession.

301.     The value of the Storbyte equipment converted by Defendants to the exclusion of Highmore's right of possession is to be determined at trial.

302.     Defendants TGC and Greig were and are obligated to make payment to Highmore for the Storbyte equipment paid for by Highmore pursuant to the Payment Agent Agreement or return the Storbyte equipment to Highmore.

303.     Defendants' unauthorized conversion of the Storbyte equipment to the exclusion of Highmore has caused Highmore to suffer damages.

304.     Defendants' failure to make such payment to Highmore for the Storbyte equipment constitutes conversion and has damaged Highmore in at least the amount of $19,954,515.07.

170421133

## PRAYER FOR RELIEF

**WHEREFORE**, Highmore respectfully prays that this Court grant the following relief:

305.    Entering judgment in favor of Highmore in a final order against each of the Defendants;

306.    Awarding actual damages, treble damages, punitive damages, equitable relief, and attorneys' fees and all costs and expenses of suit pursuant to Highmore's racketeering claims; and

307.    All other relief as provided by law and/or as the Court deems appropriate and just.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury as to all issues.

Dated:  New York, New York
        December 22, 2021

ARNOLD & PORTER KAYE SCHOLER LLP

By:  /s/ Eric N. Whitney
     Eric N. Whitney
     Muriel S. Raggi
     250 West 55th Street
     New York, New York 10019
     (212) 836-8000
     eric.whitney@arnoldporter.com
     muriel.raggi@arnoldporter.com

     *Attorneys for Plaintiff*

170421133